

**SO ORDERED.**
**SIGNED this 5th day of February, 2015**


_Shelley D. Rucker_
**Shelley D. Rucker**
**UNITED STATES BANKRUPTCY JUDGE**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

VINCENT PERRY MORSE and                     No. 13-13188
MARY LYNN MORSE,                            Chapter 7

       Debtors;

MONFORD C. RICE, II and
REBECCA RICE

       Plaintiffs,

v.
                                  Adversary Proceeding
                                  No. 13-1110

VINCENT PERRY MORSE,

       Defendant.


_Appearances for Monford C. Rice, II and Rebecca Rice_

       Scott Raymond Maucere
       Maucere Law Group LLC
       2125 Hickory Valley Road

1

Chattanooga, TN 37421

*Appearances for the Debtor*

Buddy B. Presley, Jr.
Presley & Simonds
1612 Gunbarrel Road
Suite 102
Chattanooga, TN 37421

## MEMORANDUM

Plaintiffs Monford C. Rice, II and Rebecca Rice (collectively "Plaintiffs") filed this adversary proceeding against defendant debtor Vincent Perry Morse ("Defendant" or "Debtor") seeking a judgment from this court that a debt in the amount of $223,500 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). [Doc. No. 1, Complaint].[1] The Plaintiffs further seek interest, attorneys' fees and costs. The Defendant has filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, as incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056. [Doc. No. 63]. The Plaintiffs oppose the motion for summary judgment. [Doc. No. 68]. The Plaintiffs have also filed a motion for summary judgment. [Doc. No. 73]. The Defendant opposes the Plaintiffs' motion for summary judgment. [Doc. No. 78].

The proceeding involves claims arising from a contract for the sale of a home by a limited liability company owned at least in part by the individual Debtor in this case. The primary point of contention is whether the proceeds of an earnest money deposit of $19,500 were properly disbursed from the company's account, or in the alternative, used by the builder to construct the home. Imbedded in that relatively simple statement of the dispute are numerous other legal and factual issues that must be decided in this case. The Plaintiffs are requesting that this court determine that there are no genuine issues of fact related to whether: (1) the Debtor is

---

[1] All docket entry references refer to docket entries for Adversary Proceeding 13-1110, unless otherwise noted.

the seller of the house for which they contracted; (2) he represented that he would not disburse

the earnest money except under specified circumstances; (3) he received the money and used the

proceeds of the earnest money for purposes other than the building of the house in violation of

the terms of their agreement; (4) at the time he obtained the money, he intended to defraud the

Plaintiffs and knew or should have known that he had no ability to refund the money; and (5)

the Plaintiffs breached the contract first which would have given seller a nonfraudulent basis on

which to refuse to refund the money. Plaintiffs also contend that all of these issues have been

decided in their favor by a state court which entered a default judgment against Perry

Development, the named seller on their contract.

As discussed in detail below, the court finds that the Plaintiffs are not entitled to

summary judgment because there are genuine issues of fact related to those questions.

The Debtor has also moved for summary judgment on the issue of misrepresentation on

the basis that he never made any representation personally to the Plaintiffs. There are factual

issues regarding whether the Debtor was the alter ego of his companies and whether he

authorized his agents to make certain representations. These questions lead the court to conclude

that there are also genuine issues of fact which remain for trial on the Debtor's defenses to the

nondischargeability claims. Therefore, the court concludes that it will also deny the Defendant's

motion for summary judgment. This court has already granted the Defendant's motion to dismiss

with respect to the Plaintiffs' Section 523(a)(4) claim for defalcation. [Doc. Nos. 11, 12].

The court has reviewed the briefing filed by the parties, the pleadings at issue, and the

applicable law and makes the following findings of fact and conclusions of law pursuant to Fed.

R. Bankr. P. 7052.

## I.    Background Facts

The court will summarize the relevant facts as alleged by each party, keeping in mind that each motion for summary judgment must be viewed in the light most favorable to the non-moving party and noting where there is agreement or disagreement. Defendant is an individual resident of Hamilton County, Tennessee who is the owner of Deck Masters, Inc. ("Deck Masters"). [Doc. No. 73-2, Plaintiffs' Memorandum in Support of Motion for Summary Judgment, pp. 3, 8 and 10]; [Doc. No. 78, Memorandum in Opposition to Motion for Summary Judgment]. The Debtor is an active member of North Chattanooga Enterprises, LLC ("NCE"). The parties dispute the extent of his ownership based on loans or investments made by Leslie Fox in NCE. *See* [Doc. No. 75, Ex. H to Plaintiffs' Motion for Summary Judgment, Audio Recording, Creditors Meeting Time, October 23, 2014 10:05-10:07 a.m.]. The Debtor filed his voluntary Chapter 7 bankruptcy petition on June 28, 2013. [Bankr. Case No. 13-13188, Doc. No. 1].

## A.    The Agreement Between the Parties

On May 26, 2011 the Plaintiffs contracted with Perry Development for the purchase of a lot and personal residence in the Perry Run subdivision. The residence had not been constructed and the financing of the building was not the responsibility of the Plaintiffs. The Defendant has taken the position in litigation in the Chancery Court of Hamilton County ("Chancery Lawsuit") that Perry Development is a trade name for NCE by suing the Plaintiffs for breach of the contract as NCE. *See* [Doc. No. 73-5, Ex. B to Plaintiffs' Motion for Summary Judgment]. However, at his deposition he also stated that Perry Development was used as a trade name for Deck Masters. [Doc. No. 73-8, Deposition of Vincent Morse, August 6, 2014 ("2nd Morse Dep."), p. 190]. The Plaintiffs contend that Perry Development is a name under which the Defendant did

business, although they treated it as a separate entity in their Chancery Lawsuit third party

complaint discussed below. The court finds that Perry Development is nothing more than a trade

name, but for which of the entities it was the trade name is in dispute.

The document evidencing the parties' sales agreement was a "New Construction

Purchase and Sale Agreement" ("Sale Agreement"). [Doc. No. 73-4, Ex. A to Plaintiffs' Motion

for Summary Judgment]. The Sale Agreement is not signed because the Plaintiffs and the

Defendant went through at least one revision and two counter offers before agreeing to the final

terms.  In the revision, a special provision was added in paragraph 18 of the Sale Agreement. It

provided that the "Builder/Seller [was] to provide a front and rear elevation of the house,

breezeway, and garage. Elevations must be acceptable to buyers [sic]." [Doc. 73-4, Ex. A, p. 29].

It was signed by the Plaintiffs on May 19, 2011. *Id.* at p. 30. A counteroffer designated as No. 1

was prepared by the Defendant and submitted to the Plaintiffs which provided that the "Builder"

would be paid 5% of the purchase price as "earnest money." The prior version of the Sale

Agreement provided in Paragraph 3, entitled "Earnest Money," that Coldwell Banker Pryor

Realty, Inc. would be the holder of a deposit of $5000 defined as the "Earnest Money." [Doc. 73-

11, p. 3]. The realty company was defined as the "Holder." This counteroffer changed the

amount of earnest money required and the identity of the Holder. The counteroffer also stated

that "[a]ll other terms of the Sale Agreement were acceptable to the undersigned."  *See* [Doc.

Nos. 1-1, 1-2, Complaint, Ex. A, Ex. B]

The Plaintiffs rejected this counteroffer and made a second counteroffer which still

allowed the builder to be the holder of the earnest money but identified the builder as Vincent

Morse, the Debtor. They also added that the earnest money shall be refundable. *See* [Doc. No. 1-

2, Complaint, Ex. B]. Counter Offer #2 also provided that "all other terms of the Paragraph 3 –

5

Earnest Money shall remain the same. " *Id.* On May 26, 2011 Counter Offer #2 was signed by the Plaintiffs as individuals and by the Debtor without any designation that he was signing as a corporate representative. There appears to be no dispute that the parties' agreement is reflected in the revised "Sale Agreement," "Exhibit A," "Exhibit B," and "Counter Offer 2." The court will refer to all of these documents collectively as the "Agreement."

The Agreement stipulated that the Plaintiffs were purchasing lots 25 and 26 in the Perry Run Subdivision located at 840 Dallas Road, Chattanooga, Tennessee (the "Property") with the expectation that the Seller would construct a home for the Plaintiffs for a total amount of $390,000. The Seller was also the party obligated to refund the earnest money of $19,500. [Doc. No. 73-11, Exhibit I, New Construction Purchase and Sale Agreement, p. 8, ¶ 25]. Because Perry Development was named as the Seller, and Perry Development is only a trade name, there is an issue of fact as to which party owes the refund.

There is no dispute that the Plaintiffs delivered a check dated May 27, 2011 for the earnest money in the amount of $19,500. [Doc. No. 73-12, Ex. K to Plaintiff's Motion for Summary Judgment]. The check was made payable to the Defendant personally in compliance with the change in the identity of the Holder which the Defendant's agent requested in Counter Offers 1 and 2 and to which the Plaintiffs agreed. The receipt of the funds was reflected on the ledger of Deck Masters on June 2, 2011. [Doc. No 73-10, Ex. G, Ledger of Deck Masters Account, p. 8]. The funds were commingled with loan proceeds and partially spent on loan payments on other properties, travel expenses and personal expenses. *Id.* at pp. 8-24. During 2011, the ledger never shows a negative balance. It does, however, reflect balances as high as $231,000 on June 24, 2011. *Id.* at p. 10. On or after August 8, 2011, when the Plaintiffs requested the return of their earnest money, there were several occasions when the ledger

6

showed balances in excess of the amount of the earnest money deposit. *See id.* at p. 14 (Sept. 1, 2011 Deposit of $53,800); p. 19 (Deposit of $33,500 on November 15, 2011); p. 20 (Deposit of $112,070.41 on November 17, 2011). The earnest money has never been returned.

The parties agree that these are the relevant portions of the Agreement related to the earnest money:

**Earnest Money.  In the event that the Seller is the holder of the Earnest Money, Buyer acknowledges that said funds may be used for the construction of Property.** In the event any Earnest Money check is not honored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller. Buyer shall have (1) day after notice to deliver good funds to Holder. In the event Buyer does not timely deliver good funds, Seller shall have the right to terminate this Agreement upon written notice to Buyer via the Notification form or equivalent written notice. Earnest Money is to be deposited promptly after the Binding Agreement Date or the agreed upon delivery date in this Earnest (sic) paragraph or as specified in the Special Stipulations paragraph contained at paragraph 29 herein. Holder shall disburse Earnest (sic) only as follows:

> (a) at closing to be applied as a credit toward Buyer's Purchase Price;
> (b) upon a written agreement signed by all parties having an interest in the funds;
> (c) upon order  of a court or arbitrator having jurisdiction over any dispute involving the Earnest Money;
> (d) upon a reasonable interpretation of the Agreement; or
> (e) upon the filing of an interpleader action with payment to be made to the clerk of the court having jurisdiction over the matter.

Holder shall be reimbursed for, and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Holder. No party shall seek damages from Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under this Earnest Money paragraph. Earnest Money shall not be disbursed prior to fourteen (14) days after deposit unless written evidence of clearance by bank is provided.

Agreement, p. 3, ¶ 3. A provision regarding defaults indicates:

**Default.** Should Buyer default hereunder, the Earnest Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific

performance of the Agreement, or both. Should Seller default, Buyer's Earnest
Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract
or tort, for damages or specific performance of this Agreement, or both. In the
event that any party hereto shall file suit for breach or enforcement of this
Agreement . . . , the prevailing party shall be entitled to recover all costs of such
enforcement, including reasonable attorney's fees.

*Id.* at p. 29, ¶ 25.

With respect to whether the Agreement was breached, Section 28, entitled, "Special

Stipulations," states:

This offer is subject to the following:

*Builder/Seller to provide a copy of Covenants and Restrictions.
*Builder/Seller to provide a front and rear elevation of the house, breezeway, and
garage. Elevation must be acceptable to buyers. . . .

*Id.* at p. 29, ¶ 28.

**Limitations.** The home shall be constructed in accordance with good
building practices and substantial accordance with the plans and specifications
selected and approved by the Buyer. Seller expressly reserves the right to make
such changes or substitutions in the construction of the home:
        (a) as may be required, authorized, or approved by governmental agencies
having jurisdiction therefore, without the Buyer's consent;
        (b) as Seller may deem appropriate so long as materials of equal or better
quality are used, without the Buyer's consent; and/or
        (c) as may be otherwise reasonably required as long as changes which
affect the aesthetics or livability of the home shall be subject to the Buyer's
written approval.

[Doc. No. 73-4, Ex. A, pp. 24-25, ¶ 4].

**B.    The Alleged Breach of the Parties' Agreement**

**1.    Approval of the Elevations**

The parties are in agreement that the Plaintiffs were entitled to see the final "elevations"

for the house, and there is a requirement that those elevations "be acceptable." They were not

acceptable to the Plaintiffs, and they wanted out of the contract and their earnest money

refunded. This is where the Agreement ends. The Debtor testified that he does not think that the

elevations he provided changed the elevations that were initially provided to and approved by the

Plaintiffs.  He contends that the changes were made to satisfy governmental authorities when a

mistake was discovered regarding the location of a sewer line. He contends that the Agreement

allowed him to make those changes without the Buyer's consent. [Doc. No. 73-4, Ex. A, pp. 24-

25, ¶ 4].

The regional planning agency required the company to eliminate two of its lots to

accommodate the fire marshal's requirements for fire hydrant access and to build a retaining

wall. 1st Morse Dep., pp. 84-85. He further testified that the Plaintiffs "were at an advantage

because they got a half of another lot." *Id.* at p. 86. To accommodate the new requirements by

the regional planning agency, the Debtor decided to give the Plaintiffs a "whole side yard of 50,

60 feet." *Id.* at 86. He explained that "I had $13,000 into the additional wall, I lost half of a lot,

and we were moving forward in that time frame. It's pretty arduous when you deal with the

city." *Id.* at 87. He did not feel that he breached the contract because "this wasn't a design

change through me because I just felt like it. We would never divert from the original one unless

there was a good reason." *Id.* at 89. In his second deposition, the Debtor catalogued several

different reasons for the design changes, including the city's decision not to widen the alley, as

well as the engineering involved on the site. 2nd Morse Dep., pp. 115-116.

In a series of emails between Ms. Outlaw, the Defendant's or NCE's realtor, and the

Plaintiffs, the parties discussed the Plaintiffs' dissatisfaction with the relocation and changes in

the design of the house. [Doc. No. 73-14, Ex. M]. Mrs. Rice emailed her realtor in the morning

of August 7, 2011 that "[y]ard is so tiny! They moved the house to the right and the retaining

wall is next to the house instead of the setback line on Dallas. Most of the left of lot is unusable.

We are sending our thoughts to them and including you. Just wanted to let you know that this

9

doesn't work for us." *Id.* at p. 13. At 10:59 p.m. on August 7, 2011 Mrs. Rice emailed all the

interested parties a summary of the Plaintiffs' problems with the revised home plans, concluding

with "[u]nfortunately, with the way the house, deck, retaining wall, and yard are currently

situated, we cannot accept the current plan." *Id.* at p. 20.[2]

By August 8, 2011 Mrs. Rice emailed her realtor that

Kenny called and said that he was on the lot speaking with an engineer. He said
they were looking into taking the deck from between the buildings and putting it
on the back of the house. He didn't mention the retaining wall in his message. He
said they would send another drawing. What are our options? We are about ready
to through [sic] in the towel on this house. We need some yard for dogs. House
seems overpriced now with so much unusable lot space.

*Id.* at p. 18. Their realtor responded, "I think we should wait and see what he comes up with. If

you are not happy, then I think you should back out, get back your earnest money and move on

to another house." *Id.* Mrs. Rice concluded that "[t]hat is what we will do if we don't like what

he has in mind. How hard is it to get put of this do you think?" *Id.*

Ms. Outlaw also described the situation involving changes to the deck on the Property in

her deposition:

My understanding of the reason why they were going to need to make
changes, and there might be more to it than this, but one thing was the sewer
easement went farther than maybe he originally thought. This might have been the
case, but you would have to check with him. They might have been, when we
were negotiating this, extending the sewer, so maybe they didn't know exactly
where it was gonna go. That might have been part of the problem. But I know
regarding the deck, that was the major issue.

Now, another change that was made from what it looks like now to then is
if you're looking at the First Elevation, Original, the front elevation part, this
wall, they had to do the retaining wall differently.

Outlaw Dep., pp. 86-87. It was also necessary for the plans to have a "revised elevation." *Id.* at

95. Ms. Outlaw explained that:

---

[2] It appears that Mr. Rice may have written at least some of the emails sent from Mrs. Rice's account based on his
deposition testimony. [Doc. No. 78-6, Ex. F, Deposition of Monford Rice ("Rice Dep."), pp. 3, 8].

that was, from what I understood, the final straw. They saw it and they didn't like it. I do remember that [the Plaintiffs' realtor] said—this isn't exact wording, but it's pretty close—that she felt like the house looked like it was going to fall off the side of the hill and they didn't like that. . . .That the buyers didn't like it. So I think that the buyers' point of view at that point was we're not going to have any yard, and we're very upset, and we can't continue in this process. The seller's point was that you are going to have a yard, you know, actually you're going to have more yard; let's talk about it. But I think at that point the buyer had seen the revised elevation and they didn't want to talk about it anymore. They were done and that was it. That's what I remember happening.

*Id.* at 96.

Ms. Outlaw recalls the Plaintiffs asking for their earnest money back, and she described her recollection of the Defendant refusing to release the Plaintiffs from their contract. *Id.* at 100-101. The Debtor testified that the Plaintiffs' home was "grossly underpriced." 1st Morse Dep., p. 76. An inspector for the regional planning agency required the Debtor and NCE to build "a couple of retaining walls that weren't in the budget." *Id.* The inspector "made [them] do a retaining wall that was actually engineered into an abutment to, to hold the house up." *Id.* at p. 77. From the Debtor's perspective, he had to spend $13,000 more on the house, and the changes made the home better. *Id.*

The Plaintiffs sought a return of their earnest money and a release from the contract with a form entitled, "Earnest Money Disbursement and Mutual Release of Purchase and Sale Agreement" indicating that the reason for the return of the earnest money was that the "[b]uyers are in agreement that the revised house and lot elevations are not acceptable." [Doc. No. 73-13, Ex. L]. The Defendant refused to return the earnest money.

The Plaintiffs contend that their revisions which added a right to approve the elevations essentially trumped the Seller's right to make changes to satisfy the governmental authorities. The Plaintiffs contend that the contract gave them an unqualified right to walk away if the final elevations were not acceptable regardless of whether the elevations changed. Whether an

elevation was initially approved and whether it changed is a genuine issue of material fact that is at the heart of the dispute. If the Plaintiffs breached the contract, then the contract is clear that the earnest money is forfeited, and the Plaintiffs have no claim. If their right to review and approve the elevations was a condition precedent to enforceability of the Agreement, then the Plaintiffs were entitled to a refund and the other questions regarding the obligations of the holder of the escrow money and his relationship to the party promising the refund of the earnest money must be decided.

### 2. Fraudulent Disbursement of Earnest Money

With respect to the representations regarding the earnest money and its subsequent disbursement, the Defendant admitted in an initial deposition taken in 2013 that he did not keep the Plaintiffs' earnest money in an escrow account. [Doc. No. 73-6, Ex. C, Deposition of Vincent Morse dated August 27, 2013 ("1st Morse Dep."), p. 91]. The Plaintiffs further assert that NCE was intentionally underfunded and that funds in NCE were transferred to another company owned by the Debtor, Deck Masters. They allege the Defendant used the earnest money for his personal and general operating expenses and never returned the money to the Plaintiffs. *See id.* Further, they rely on this conduct as evidence of his fraudulent intent from the beginning of their relationship.

The Defendant noted that his "position was, in the beginning, I didn't feel we broke the contract." 1st Morse Dep., p. 91. He used the earnest money for "capital." *Id.* It was deposited into a "general account." *Id.* at p. 92. Following the Plaintiffs' decision to terminate the contract with the Defendant and his completion of construction of the residence, the Defendant sold the Property. *Id.* at pp. 92-93. Although he may have made a profit on the Plaintiff's Property, he was in debt on many other properties. *Id.* at pp. 93-94. [Doc. No. 69, Deposition of Caroline

Outlaw ("Outlaw Dep."), pp. 110-112].

The Plaintiffs allege that the Defendant created NCE as a way to fund the financially stressed Deck Masters without the creditors of Deck Masters being able to reach those funds. Complaint, ¶ 14.c. The Debtor admitted that money provided to NCE was intermingled with funds relating to Deck Masters. 1st Morse Dep., p. 34, 94. He just "deposited it in the operating account for Deck Masters, Inc." *Id.* at 94. He further admitted that Deck Masters and NCE were "really one company." 2nd Morse Dep., p. 190. The Defendant admitted in his deposition that the two companies regularly used the same employees and that Deck Masters was the "mother company." 1st Morse Dep., pp. 31, 26-27. The Defendant does not remember reading any corporate minutes relating to NCE. 1st Morris Dep., p. 44-45. He is certain that his bookkeeper must have created some minutes. *Id.* From these facts the Plaintiffs ask the court to find that all of the Defendant's entities are alter egos of one another.

### C.    Prior Litigation Between the Parties

The parties began litigating their disputes in a state court case prior to the Defendant's bankruptcy filing. NCE filed the Chancery Lawsuit in the Chancery Court of Hamilton County, Tennessee, Docket No. 12-0272 on May 3, 2012. [Doc. No. 78-1, Ex. A, Chancery Lawsuit Complaint]. The NCE's claims against the Plaintiffs included a claim for breach of contract and specific performance, fraud and/or negligent misrepresentation. *See id.* The Defendant filed his bankruptcy petition on June 28, 2013.

Plaintiffs filed an amended answer and counterclaims of breach of contract, fraud, conversion, and unjust enrichment against the NCE in the Chancery Lawsuit on July 2, 2013. [Doc. No. 73-4]. In their amended answer to the Defendant's Chancery Lawsuit Complaint, the Plaintiffs described their perception of the Defendant's revisions to their plans:

13

> On August 7, 2011, Defendants received revised elevation plans from [Defendant]
> and NCE. These revised plans showed a drastically altered house and property. . .
> The Revised Plans (and subsequent inspection of the Property) showed the house
> had been shifted in its location, the back porch had been moved (its view now
> obscured by a billboard further down the hill), and most seriously, the elevation
> had been so altered that the retaining wall would be placed so closely to the back
> of the house that the back porch would hang over the retaining wall and would not
> provide for any backyard at all.

[Doc. No. 73-4, Ex. A, pp. 10-11]. The Plaintiffs alleged that they did not consent to the changes

in the plans nor did Defendant seek their opinion regarding the changes. The Plaintiffs found the

changes to be unacceptable. *Id.* at p. 11. They filed their counterclaims against NCE, and three

other third-party defendants, Perry Development Company ("Perry Development"), the

Defendant, and Kenneth Slayton. [Doc. No. 73-4, Ex. A]. Their claims included return of their

earnest money based on the terms of the Agreement, breach of contract, conversion, and breach

of fiduciary duty, unjust enrichment, fraud, and piercing the corporate veil. *Id.* They also sought

damages, attorneys' fees, and punitive damages. *Id.*

On July 3, 2013 the Chancellor entered an order which included a default judgment

against Perry Development, due to its failure to answer the Plaintiffs' Cross-Claims. The order

also included dates for the Defendant and NCE to appear for depositions. It did not grant a

default judgment against either of these parties. [Doc. No. 73-5, Ex. B]. In support of his

opposition to the Plaintiffs' motion for summary judgment, the Defendant has filed an exhibit

that he claims contains an answer to an interrogatory regarding the corporate status of Perry

Development. [Doc. No. 78-2, Ex. B]. In the interrogatory, the Defendant asserted that "Perry

Development is an unincorporated entity and was used as a doing business as (d/b/a) as part of

Deckmasters, Inc. There were no officers or positions held by anyone." *Id.*

## II.      Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this

district, provide this court with jurisdiction to hear and decide this adversary proceeding.  The

Plaintiffs' action regarding the dischargeability of particular debts is a core proceeding.  *See* 28

U.S.C. § 157(b)(2)(I).

### III.   Standard of Review

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56

applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment

is appropriate if there is no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show

conclusively that no genuine issue of material fact exists, and the Court must view the facts and

all inferences to be drawn therefrom in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete

Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d

1432, 1435 (6th Cir. 1987); *Kava v. Peters*, No. 09-2327, 2011 WL 6091350, at *3 (6th Cir. Dec.

7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed. R.

Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The

nonmoving party is required to come forward with some significant probative evidence which

makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving

party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing

on an essential element of the nonmoving party's case with respect to which the nonmoving

party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th

Cir. 1996).

IV.      **Analysis**

A.      **Collateral Estoppel of Default Judgment Issued Against Perry Development**

The Plaintiffs argue that the state court judgment granted against Perry Development has preclusive effect on this proceeding. There is no dispute that a default judgment against Perry Development exists. In the state court proceeding, NCE treated Perry Development as though Perry Development was a trade name for it by suing only in the name of NCE to enforce a contract in which NCE never appears. The Plaintiffs in this case treated the two entities as separate entities by suing Perry Development in a third party action and obtaining a default judgment against Perry but not against NCE. There is no dispute that NCE and the Defendant responded and the Plaintiffs were not entitled to a default judgment against either. Deck Masters is not named at all.

The Full Faith and Credit Clause states in relevant part that: "[s]uch . . . judicial proceedings . . . so authenticated, shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. The U.S. Supreme Court has clarified that whether an issue raised in a subsequent federal court proceeding is precluded by an earlier state court judgment must be determined by reviewing the law of the State that issued the judgment. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327 (1984). As the Supreme Court explained in *Marrese*,

> This statute directs a federal court to refer to the preclusion law of the State in which judgment was rendered. "It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken."

*Id.* at 380, 105 S.Ct. at 1332 (quoting *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481-82, 102

16

S.Ct. 1883, 1897 (1982)); *see also, Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315,

317 (6th Cir. 1997).  Further, the Supreme Court has also clarified that "collateral estoppel

principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."  *Grogan v.*

*Garner*, 498 U.S. 279, 285 n.11, 111 S.Ct. 654, 658 n.11 (1991).

The Sixth Circuit has informed courts in this circuit that collateral estoppel will apply if:

"(1) the law of collateral estoppel in the state in which the issue was litigated would preclude

relitigation of such issues, and (2) the issue was fully and fairly litigated in state court."

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461 (6th Cir. 1999).  As another court in

this district explained, "[u]nder Tennessee law, 'collateral estoppel bars relitigation of an issue if

it was raised in an earlier case between the same parties, actually litigated, and necessary to the

judgment in the earlier case.'" *Tucker v. Cross (In re Cross)*, No. 08-5029, 2009 WL 981900, at

*3 (Bankr. E.D. Tenn. Apr. 13, 2009) (quoting *Rally Hill Prod., Inc. v. Bursack (In re Bursack)*,

65 F.3d 51, 54 (6th Cir. 1995)).

Because the Plaintiffs chose to treat Perry Development as a separate entity in the state

court matter, they may not now claim that the element of "same parties" was met. Neither party

has cited any Tennessee authority to the court having a similar fact pattern that would support

such a result.

Rulings from other jurisdictions support this court's conclusion that the default judgment

should not be given preclusive effect in this case. If Perry Development is merely a trade name,

the default judgment entered against it may be void under state law because a trade name does

not create a separate legal entity subject to suit that may be made a party defendant. *See Fried v.*

*Wellesley Mazda,* 2010 Mass. App. Div. 36 (Mass. App. Div. 2010); *Bauer v. Pounds,* 762 A.2d

499, 504 (Conn. App. Ct. 2000).  In addition, if Perry Development is a nominal party only and

the real party in interest filed an answer in the state court proceeding, a no-answer default

judgment would not have a preclusive effect against the real party in interest or any defendant

that has successfully filed an answer as that would be manifestly unfair. *New Caney Indep. Sch.*

*Dist. Bd. of Trustees v. Burnham Autocountry, Inc.*, 960 S.W.2d 957, 959 (Tex. Ct. App. 1998).

As a general rule, "a default judgment against one defendant when multiple defendants are

involved in an action, should not be granted if there was a possibility of inconsistent judgments

from the answering defendants' success on the merits and the other defendant's default."

*Broadcast Music Inc. v. Wheels, Inc.*, No. 1:07cv78, 2008 WL 1751522, at *3 (E.D. Tenn. Apr.

11, 2008) (citing *Frow v. De La Vega*, 82 U.S. 552 (1872)). In fact, if a favorable determination

is made in the state law case as to the answering defendants, such as dismissal or summary

judgment in their favor, it will accrue to the benefit of the defaulting defendant. *Wright & Miller,*

10A Fed. Prac. & Proc. Civ. § 2690 (3d ed.). *See also Dassault Systemes, SA v. Childress,* 663

F.3d 832, 840 (6th Cir. 2011). Thus, the court will not grant the Plaintiffs summary judgment on

any of their claims based on the default judgment they obtained against Perry Development in

the Chancery Lawsuit.

### B.      Section 523(a)(2)(A) Claim

11 U.S.C. § 523(a)(2)(A) prohibits discharges of debt based on "(A) false pretenses, a

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition; . . ." The Sixth Circuit has held that to demonstrate nondischargeability

pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the
> time, the debtor knew was false or made with gross recklessness as to its truth; (2)
> the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the
> false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998). Each element must be demonstrated by a preponderance of the evidence.

An objection to dischargeability may be based on something broader than a specific statement by the debtor. In *In re Vitanovich* the Sixth Circuit Bankruptcy Appellate Panel addressed the meaning of "actual fraud" within the context of § 523(a)(2)(A):

> We adopt the position of the Court of Appeals for the Seventh Circuit that actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

*Mellon Bank v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). The Sixth Circuit Bankruptcy Appellate Panel made clear that it finds that "actual fraud" is broader than a misrepresentation and encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *In re Vitanovich*, 259 B.R. at 877 (citing *McClellan*, 217 F.3d at 893). The Sixth Circuit Bankruptcy Appellate Panel further explained that:

> "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud."

*In re Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)) (other quotation omitted).

It is true, as the Plaintiffs assert, that "[a] finding of fraudulent intent may be made on the basis of circumstantial evidence, as direct proof of intent will rarely be available." *FIA Card Servs., N.A. v. Wagner (In re Wagner)*, No. 10-36900, 2012 WL 6737830 (Bankr. N.D. Ohio Dec. 28, 2012) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999)). However, "where a debtor's subjective intent is at issue, summary judgment is generally

inappropriate unless all reasonable inferences defeat the claims of the opposing party." *Wagner*,

2012 WL 6737830 at *5.

### 1.        Defendant's Motion for Summary Judgment on False Pretenses

Defendant seeks summary judgment on the Plaintiffs' claims under Section 523(a)(2) on

the basis that there is no factual dispute that he never made a representation to the Plaintiffs. He

contends that without proof of a misrepresentation made by the Debtor, the Plaintiffs cannot, as a

matter of law, prove the first element of a Section 523(a)(2) claim. The court disagrees with this

contention. While the Plaintiffs admit that the Debtor did not make any verbal misrepresentations

to them, the Plaintiffs have provided significant probative evidence that the Debtor, either

individually or as president of NCE, had his agents make statements in the Agreement about the

disbursement of the earnest money and the accountability of NCE for the refund that may satisfy

the element of a misrepresentation.

Principals can be held liable for a nondischargeable obligation pursuant to Section

523(a)(2)(A) for an agent's misrepresentations. The liability will depend on state agency law. As

explained by the bankruptcy court in *Kodz v. Trotter (In re Trotter)*,

> Issues of agency liability under 11 U.S.C. § 523(a)(2)(A) are influenced by state
> law. . . .
> In Tennessee, a principal "will be liable for false and fraudulent representations of
> his agent in effecting a sale of lands and goods." Further, "[a] principal who
> accepts the benefit of a contract made on his behalf by his authorized agent, will
> be held responsible for the fraudulent misrepresentations of the agent, although
> made without his authority." . . . .
> The Court finds that under Tennessee's agency law, the debtor is personally liable
> for any fraudulent misrepresentations made by his sales representative, whom he
> employed to contact potential customers and solicit vehicles to be auctioned
> through the debtor's business.

No. 312-90232, 2013 WL 3013339, at *4 (Bankr. M.D. Tenn. June 17, 2013).

The Plaintiffs cite *Harben v. Hutton* in support of their argument that the Defendant may

be held responsible for misrepresentations of his agents, even if he did not have contact with the

20

Plaintiffs. 739 S.W.2d 602, 605-06 (Tenn. Ct. App. 1987). In that case the court of appeals noted

that even though the landowner "never dealt directly" with the buyers of his real estate, "a

landowner may be liable to a purchaser for the misrepresentations of his broker or agent." *Id.* at

605. The appellate court explained:

> Determining whether an agency relationship exists requires an examination of the
> conduct and relationship between the parties. An agency relationship does not
> require an explicit agreement, contract or understanding between the parties. If
> the facts establish the existence of an agency relationship, it will be found to exist
> whether the parties intended to create one or not.
>
> An agency relationship cannot be proven by the extrajudicial statements of the
> agent alone. Its existence must be traceable to the principal, because an agency
> relationship is created by the actions of the principal, not the actions of the agent.
> Thus, an owner must say or do something to make a broker his agent before a
> court will find that an agency relationship exists between the owner and the
> broker.

*Id.* at 606. Further, an

> "[a]gency in its broadest sense includes every relation in which one person acts
> for or represents another." "Whether an agency has been created is to be
> determined by the relations of the parties as they in fact exist under their
> agreements or acts. If relations exist which will constitute an agency, it will be an
> agency, whether the parties understood it to be or not."

*Kerney v. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247, 252 (Tenn. Ct. App. 1982) (quoting *Smith v.*

*Tennessee Coach Co.*, 194 S.W.2d 867, 869 (Tenn. Sup. Ct. 1946)) (other quotation omitted). In

addition,

> [a]n element of the agency relationship is that the object of the contract be for the
> benefit of the principal. . . the principal test of agency is whether the principal has
> a right to control the conduct of the agent with respect to matters entrusted to the
> agent. It is said this right of control is the primary or the essential test of an
> agency relationship without which no agency exists.

*Nidiffer v. Clinchfield Railroad Co.*, 600 S.W.2d 242, 245 (Tenn. Ct. App. 1980) (citations

omitted).

The Defendant admits that Mr. Slayton was the "project manager," which included

supervising "the scheduling, over[seeing] the managing of the subs, deal[ing] with the inspectors." 1st Morse Dep. at p. 62. In addition, Ms. Outlaw was acting on behalf of the Defendant as his realtor. There is some evidence suggesting that the Defendant controlled the actions of Mr. Slayton and Ms. Outlaw with respect to handling the interactions with the Plaintiffs. The Defendant's deposition testimony indicates that he decided when to call a meeting regarding the progress of the Agreement with the Plaintiffs and that he delegated all communications with the Plaintiffs to Ms. Outlaw and Mr. Slayton. *See e.g.*, 1st Morse Dep., pp. 86-87, 89. The Plaintiffs also allege that Mr. Slayton represented himself as a licensed contractor to induce them to enter into the contract and to provide the Debtor with the $19,500. They further assert that the Defendant used the $19,500 to fund the ordinary operations of NCE and Deck Masters rather than placing the funds in an escrow account or using them solely for the construction of the residence. The court finds that these allegations create a factual issue related to whether misrepresentations were made by the Defendant's agents. Therefore the Defendant is not entitled to summary judgment on the section 523(a)(2) claim.

### 2.    Plaintiffs' Motion for Summary Judgment based on 11 U.S.C. § 523(a)(2)

As for the Plaintiffs' motion for summary judgment on their Section 523(a)(2) claim, there are factual issues related to whether the Debtor knew that the representations being made were false at the time they were made and whether the Debtor intended to deceive the Plaintiffs. There is no admission by the Defendant that he intended to defraud the Plaintiffs so they rely on circumstantial evidence. The evidence they cite initially in support of fraudulent intent is the financial condition of NCE. They allege that NCE and the Defendant and his other entities owed millions in debt. That debt load made it impossible to refund the money. They claim NCE and

Deck Masters were insolvent and that the Defendant knew that he and his companies would

never be able to repay the money.

In *In re Rembert* the Sixth Circuit addressed whether the use of a credit card without an

ability to repay the debt charged sufficed to demonstrate the fraudulent intent necessary to prove

a Section 523(a)(2)(A) claim. The Court noted:

> We believe that "the representation made by the cardholder in a credit card
> transaction is not that he has an ability to repay the debt; it is that he has an
> intention to repay." To measure a debtor's intention to repay by her ability to do
> so, without more, would be contrary to one of the main reasons consumers use
> credit cards: because they often lack the ability to pay in full at the time they
> desire credit. Further, the language of § 523(a)(2)(A) expressly prohibits using a
> "statement respecting the debtor's or an insider's financial condition" as a basis
> for fraud. As noted by the Ninth Circuit,
>
>> the focus should not be on whether the debtor was hopelessly
>> insolvent at the time he made the credit card charges. A person on
>> the verge of bankruptcy may have been brought to that point by a
>> series of unwise financial choices, such as spending beyond his
>> means, and if ability to repay were the focus of the fraud inquiry,
>> too often would there be an unfounded judgment of non-
>> dischargeability of credit card debt. Rather, the express focus must
>> be solely on whether the debtor maliciously and in bad faith
>> incurred credit card debt with the intention of petitioning for
>> bankruptcy and avoiding the debt. A finding that a debt is non-
>> dischargeable under 523(a)(2)(A) requires a showing of actual or
>> positive fraud, not merely fraud implied by law  . . . . While we
>> recognize that a view to the debtor's overall financial condition is a
>> necessary part of inferring whether or not the debtor incurred the
>> debt maliciously and in bad faith, . . . the hopeless state of a
>> debtor's financial condition should never become a substitute for
>> an actual finding of bad faith.

*In re Rembert*, 141 F.3d at 281 (quoting *Anastas v. American Savings Bank (In re Anastas)*, 94

F.3d 1280, 1287 (9th Cir. 1996)) (other citations omitted). The Sixth Circuit emphasized that

intent could be demonstrated through a review of the "totality of the circumstances" rather than

mere "factor-counting." *In re Rembert*, 141 F.3d at 282.

One bankruptcy court explained what a review of circumstantial evidence might reveal

about a debtor's intent:

> Alone, a broken promise will not establish the existence of any intent to deceive. Rather, the existence of fraudulent intent under § 523(a)(2)(A) hinges on whether the debtor, at the time the debt is incurred, intended to honor the obligation. Although the intent to defraud must arise in conjuncture with the debt, a debtor's subsequent conduct will often help to shed light on the debtor's state of mind at the time of the transaction.
> Of significance, a debtor acting with the intent to defraud will not generally undertake measures to perform their obligation. And logically, the opposite holds true; where a debtor undertakes significant steps to perform as promised, any inference of fraud is muted. On whole then, a type of inverse relationship exists when weighing a debtor's intentions: the further the extent of performance, the less likely there exists fraud. To use a simple credit transaction as an example, it is the highly unusual situation where a person taking extensions of credit—e.g., cash advances—with the present intention of converting the funds will make any meaningful attempt to repay the obligation.

*Mack v. Mills*, 345 B.R. 598, 604-05 (Bankr. N.D. Ohio 2006).

In this case, the court finds evidence that seemingly contradicts the Plaintiffs' contention in exhibits provided by the Plaintiffs. These exhibits raise an issue of whether the Defendant knew he was unable to repay the earnest money and was never able to repay the earnest money. [Doc. No. 73-9 and 10, Exhibits F and G, Ledgers of Deck Masters and NCE]. The ledgers show that large balances existed in the accounts from which payment could have been made. The court also notes that the residence was built and sold for more than the sale price listed in the Agreement. The bankruptcy was not filed until almost two years after the Agreement was signed. The court finds that there is an issue of fact about the Defendant's ability to repay the earnest money and what should be inferred from his performance.

The Plaintiffs also cite the statement in the Agreement that the builder will use the earnest money for construction of the property as another misrepresentation. They rely on the fact that the money was not used for construction of the property. As proof of fraudulent intent, they rely on the Defendant's admissions in his deposition that he or Mr. Slayton deposited the

money in a Deck Master's account. 1st Morse Dep., p. 91. A review of the Deck Master's ledger

indicates it was deposited in that account and that personal expenses were paid from this account.

[Doc. No. 73-10, Ex. G]. There were also loan repayments and what appear to be other business

expenses paid from the account. In opposition to the Plaintiffs' motion, the Defendant has

offered evidence through his deposition and the NCE ledger that, prior to notification that the

Plaintiffs wanted their earnest money refunded, he had spent approximately $26,000 pouring the

footings for the residence, albeit from the NCE account. [Doc. No. 73-9, Ex. F]. The court finds

that there is a genuine issue of fact regarding whether the earnest money was spent on the

Property, and if the funds were supplied from another source, whether there were any losses

caused by the misrepresentation.

With respect to the final circumstance from which the Plaintiffs seek to have the court

infer intent, the Plaintiffs rely on what they perceive to be the Defendant's evasion of his

obligation to refund the earnest money. The Plaintffs allege a pattern of nonresponsive behavior

which they characterize as "dodging" the Plaintiffs' requests. The Defendant contends he was

not aware that Mr. Slayton was not being responsive. He states he did not return the money

because the Plaintiffs attempted to reject the contract in violation of the terms of the Agreement

and were not entitled to the refund.  His contention is supported by his conduct in bringing the

Chancery Lawsuit and his and Ms. Outlaw's explanation regarding why the parties began having

problems after the Agreement was executed.

The court finds that the Defendant has come forward with substantive evidence that

raises genuine issues of fact with respect to the element of intent. As other bankruptcy courts

have noted, "'state of mind issues, such as fraudulent intent under § 523(a)(2)(A), are generally

not appropriate for resolution on summary judgment unless all the reasonable inferences that

could be drawn from the evidence clearly defeat the plaintiff's claim.' In this matter, the Debtor

has strenuously denied any intentional wrongdoing, an assertion which cannot be definitively

dismissed based upon the record now before the Court." *Behler-Young Co. v. Cousino (In re*

*Cousino)*, 364 B.R. 289, 296-97 (Bankr. N.D. Ohio 2006). In *In re Cousino* the plaintiff had

moved for summary judgment on the substantive merits of its Section 523(a)(2)(A) claim.

The court will therefore deny the Plaintiffs' motion for summary judgment with respect

to the section 523(a)(2) claims.

### C.     Section 523(a)(4) Claim

Both parties have also moved for summary judgment on the Plaintiffs' Section 523(a)(4)

embezzlement claim. 11 U.S.C. § 523(a)(4) states in relevant part: "A discharge under section . .

. 727 of this title does not discharge an individual debtor from any debt – . . . (4) for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . ." 11 U.S.C. §

523(a)(4).  Federal common law will determine the meaning of the terms in Section 523(a)(4).

*See SmithKline Beecham Corp. v. Lam (In re Lam)*, No. 06-68805-MGD, 2008 WL 7842072, at

*3 (Bankr. N.D. Ga. Mar. 27, 2008) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir.

1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988)) (other citations omitted). This court has

already dismissed the Plaintiffs' claim based on defalcation pursuant to Section 523(a)(4). Thus,

Plaintiffs' remaining Section 523(a)(4) claim is based on a theory of embezzlement.

The Sixth Circuit has explained that:

> [f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent
> appropriation of property by a person to whom such property has been entrusted
> or into whose hands it has lawfully come."  A creditor proves embezzlement by
> showing that he entrusted his property to the debtor, the debtor appropriated the
> property for a use other than that for which it was entrusted, and the
> circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), abrogated on other

grounds as explained in *National Dev. Servs. v. Denbleyker,* 251 B.R. 891 (Bankr. D. Colo.

2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)

and *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895)) and (citing *Ball v.

McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). To demonstrate

embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the

debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was

entrusted,' and (3) that 'the circumstances indicate fraud.'" *Cash America Fin. Servs., Inc. v. Fox

(In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).

The court finds that there is no issue with respect to the first element. The Plaintiffs

entrusted their $19,500 to the Defendant Vincent Morse pursuant to the terms of the Agreement.

The court finds it is a close question with respect to the second element. The Defendant

admits that the earnest money was deposited into a Deck Masters account. 1st Morse Dep., pp.

34, 94. He does not offer any contradictory evidence to the disbursement of the earnest money as

shown by the Deck Masters ledger. Exhibit G, Doc. No. 73-10 That ledger provides no evidence

that the $19,000 was used for the construction of the residence. However, he argues that he spent

other moneys from the NCE account on the construction of the residence prior to the request for

the return of the earnest money which exceeded the amount of the earnest money. [Doc. No. 73-

9, Ex. F]. He further admits that both companies were really one and the same. 2nd Morse Dep.,

p. 190. The court ultimately concludes because of the commingling of the funds and the

testimony regarding the use of funds to build the foundation there is a question of fact as to

whether the funds were used for something other than for what they were entrusted.

With respect to the third element, the Sixth Circuit has noted:

The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude
or *intentional* wrong." Accordingly, embezzlement claims under § 523(a)(4)

> require "proof of the debtor's fraudulent intent in taking the [creditor's] property."
> As the *Brady* definition suggests, the debtor's fraudulent intent may often be
> shown by circumstantial evidence.

*In re Fox*, 370 B.R. at 116 (quotations and citations omitted). Circumstantial evidence of fraud is sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent intent. *In re Fox*, 370 B.R. at 116-117. Embezzlement does not require the existence of a fiduciary relationship. *See King v. Spivey (In re Spivey)*, No. 09-3028, 2010 WL 3980132, at *11 (Bankr. E.D. Tenn. Oct. 7, 2010).

With respect to the third element of circumstances indicating fraud, issues of fact remain for the same reasons that the court found that there were issues regarding intent with respect to the misrepresentations. The Plaintiffs have asked that fraud be inferred from the Defendant's financial circumstances and his act of depositing the funds into an account for his personal use. The Defendant asks the court to determine that there was no fraud because he had no intent to refuse the refund until he concluded the Plaintiffs had breached the contract. As to the use of the funds, he contends that he provided funds to pour the footings for the residence from another source in an amount equal or greater than the amount of the earnest money. He contends that his use of the funds under that circumstance did not harm the Plaintiffs. Thus, the court concludes that both parties have demonstrated that there exist issues of fact to be determined by the court. For these reasons, the court will DENY both motions for summary judgment regarding the Section 523(a)(4) claim with respect to embezzlement.

### D.    The Plaintiffs' Section 523(a)(6) Claim

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01 (Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264

B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388

(Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and*

malicious is nondischargeable.  *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury

that is both willful and malicious.  The absence of one creates a dischargeable debt."  *In re*

*Markowitz*, 190 F.3d at 463. A creditor bears the burden of demonstrating a claim pursuant to 11

U.S.C. § 523(a)(6) by a preponderance of the evidence.  *See Steier v. Best (In re Best)*, 109 F.

App'x 1, 2, 2004 WL 1544066 (6th Cir. 2004). Such exceptions to discharge are "strictly

construed against creditors." *Id.* However, once a creditor establishes a prima facie case, "the

burden shifts to the Debtors to present credible evidence that a defense to the liability exists." *JP*

*Morgan Chase Bank, N.A. v. Zwosta (In re Zwosta)*, 395 B.R. 378, 382 (B.A.P. 6th Cir. 2008).

The U.S. Supreme Court has addressed the meaning of "willful" within the context of §

523(a)(6).  *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).  As summarized by the

Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate."
> As such, only acts done with the intent to cause injury – and not merely acts done
> intentionally – can cause willful and malicious injury.  The Court explained its
> holding by discussing the importance of context:
>
>> The word "willful" in (a)(6) modifies the word "injury," indicating
>> that nondischargeability takes a deliberate or intentional *injury*, not
>> merely a deliberate or intentional act that leads to injury.  Had
>> Congress meant to exempt debts resulting from unintentionally
>> inflicted injuries, it might have described instead "willful acts that
>> cause injury."  Or, Congress might have selected an additional
>> word or words, i.e., "reckless" or "negligent," to modify "injury."
>> Moreover, as the Eighth Circuit observed, the (a)(6) formulation
>> triggers in the lawyer's mind the category "intentional torts," as
>> distinguished from negligent or reckless torts.  Intentional torts
>> generally require that the actor intend "the *consequences* of an
>> act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless

'the actor desires to cause consequences of his act, or . . . believes that the consequences are

substantially certain to result from it,' he has not committed a 'willful and malicious injury' as

defined under § 523(a)(6)." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th

Cir. 1999).  Mere proof of conversion is not sufficient to satisfy the requirements of § 523(a)(6).

*See In re Jones*, 276 B.R. at 801. Further, "'[t]o find that a debtor intended to cause the

consequences of his act or believed that the consequences were substantially certain to result

from his act, it is necessary to look into the debtor's mind, subjectively.'" *Gabel v. Olson (In re

Olson)*, 355 B.R. 660, 665 (Bankr. E.D. Tenn. 2006) (quoting *Monsanto Co. v. Wood (In re

Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004)).

Proof of willful behavior must often be demonstrated through the use of circumstantial

evidence.  *See In re Jones*, 276 B.R. at 802.  The bankruptcy court in *In re Jones* noted that

"willful" behavior can "be indirectly established by the creditor demonstrating the existence of

two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his

conduct would cause injury to those rights." *Id.*  As another bankruptcy court in this Circuit has

observed, "[t]he willfulness element is designed to separate negligent or inadvertent acts from

deliberate and intentional ones, and to ensure that the conduct in question falls within the ambit

of an intentional tort." *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R.

180, 185 (Bankr. W.D. Mich. 2010).

A malicious injury occurs "when a person acts in conscious disregard of [his] duties or

without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing *Gonzalez v. Moffitt (In re

Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of maliciousness does not

require a determination of ill-will or specific intent. *See Monsanto Co. v. Trantham (In re*

*Trantham*), 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004). In addition, "malice does not require any ill

will or specific intent to do harm, only to do an act without just cause or excuse, but that is

beyond negligence or recklessness." *In re Wierenga*, 431 B.R. at 185.

> The Sixth Circuit has also cautioned that:
>
> the injury must invade the creditor's legal rights.  Section 523(a)(6)'s term
> "willful . . . means a deliberate or intentional invasion of the legal rights of
> another, because the word 'injury' usually connotes legal injury (*injuria*) in the
> technical sense, not simply harm to a person."  The conduct "must be more
> culpable than that which is in reckless disregard of creditors' economic interests
> and expectancies, as distinguished from . . . legal rights.  Moreover, knowledge
> that legal rights are being violated is insufficient to establish malice . . . ."

*In re Best*, 109 F. App'x at 6 (quoting *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852

(8th Cir. 1997) and *First Federal Bank v. Mulder (In re Mulder)*, 306 B.R. 265, 270 (Bankr. N.D.

Iowa 2004)).

The elements of a claim under 11 U.S.C. § 523(a)(6) are that: "(1) the debtor's conduct

was willful and malicious, (2) [the creditor] suffered an invasion of [its] legal rights or to the

legal rights to [its] property, and (3) the invasion was caused by the debtor's conduct."  *National*

*Sign and Signal v. Livingston*, 422 B.R. 645, 653 (W.D. Mich. 2009) (citing *CMEA Title Agency,*

*Inc. v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005)).

### 1.      Defendant's Motion for Summary Judgment on the Section 523(a)(6) Claim

The court will first address the Defendant's motion for summary judgment on the

Plaintiffs' Section 523(a)(6) claim. Defendant claims that the Plaintiffs contracted with NCE and

that he is not personally responsible for the actions of that corporation. He further claims that he

cannot be liable for willful and malicious injury when he never interacted with the Plaintiffs.

The Plaintiffs cite *Automotive Finance Corp. v. Rigoroso (In re Rigoroso)*, a case in which the

bankruptcy court noted that "[o]ther courts have routinely found that a debtor who is an officer

or director of a corporation can be held personally liable for the tortious acts of the corporation when he actively participated in those acts." 453 B.R. 612, 616 (Bankr. D.S.C. 2011) (citing *Theroux v. HSA Mortgage Co. (In re Theroux)*, 49 F.3d 728, 1995 WL 103342, at *4 (5th Cir. Feb. 22, 1995) and *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987)) (other citations omitted). *See also, In re Leonard*, 2012 WL 1565120, at *4 (Bankr. E.D. Tenn. May 2, 2012) (finding that under Tennessee law officer may be personally liable for corporation's tort if he committed tortious act); *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 125 (6th Cir. 1985).

In *Owens* the Eleventh Circuit affirmed the district court holding that "a personal debtor who, as an officer of a corporation, actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to said party and thus the debt is nondischargeable pursuant to section 523(a)(6)." 807 F.2d at 1559.

The court has found that Mr. Slayton and Ms. Outlaw were agents of NCE and the court finds that the Defendant's action of depositing the earnest money into Deck Master's account is evidence of active participation. Nevertheless his intentions in doing so remain in question. The Plaintiffs have alleged that he never intended to return their deposit based on his increase of the escrow amount and his immediate deposit into an account he used for personal expenses. They also have brought into question whether the Defendant reasonably believed they had breached the contract when they rejected the elevations. *See e.g. In re Ichida*, 434 B.R. 852, 863 (Bankr. S.D. Ohio 2010) (denying summary judgment on Section 523(a)(6) claim based on presence of state of mind issues involving the debtor's intent). Issues of fact remain regarding whether the Defendant's conduct in failing to return the earnest money constituted willful and malicious injury pursuant to Section 523(a)(6).The court will thus DENY the Defendant's motion for

summary judgment on this claim.

**2.      Plaintiffs' Motion for Summary Judgment on the Section 523(a)(6) Claim**

With respect to the Plaintiff's motion for summary judgment on their Section 523(a)(6)

claim, for the reasons stated above, the court also concludes that it will deny summary judgment

on this claim. Again, *In re Ichida* is helpful here. There, the bankruptcy court determined that

"[t]he Plaintiffs are not entitled to summary judgment on their remaining nondischargeability

claims—the § 523(a)(2)(A) fraud claim, the embezzlement-based § 523(a)(4) claim or the §

523(a)(6) willful-and-malicious injury claim—because there exist disputed issues of material

fact, including Ichida's intent and state of mind." 434 B.R. at 863. *See also, In re Cousino*, 364

B.R. at 296-297 (Bankr. N.D. Ohio 2006) (refusing to grant summary judgment to plaintiff

where state of mind issues were relevant and the debtor "strenuously denied any intentional

wrongdoing"); *Bank of Kentucky, Inc. v. Ruhe (In re Ruhe)*, No. 14-1142, 04-1135, 2005 WL

4030037 (Bankr. S.D. Ohio June 21, 2005) (noting that "[i]n general, it is difficult to prevail on

summary judgment when issues of subjective intent are involved").

Through his deposition testimony the Defendant has provided his version of the events

relating to the breakdown in the relationship between the parties. He asserts that a regional

planning authority required him to make changes to the plans and that he compensated for the

changes by providing the Plaintiffs with one-half of an additional lot and the addition of four feet

of width to the back of the house. Therefore, he contends that he was not in breach of the

Agreement, and the Plaintiffs were not entitled to the return of their earnest money. In addition,

there appear to be issues of fact regarding whether the Plaintiffs reneged on the Agreement due

to changes in elevation or due to changes in the yard placement and the deck. Taking the facts

alleged in the light most favorable to the Defendant, the parties' dispute revolves solely around a

breach of contract rather than a plan by the Defendant willfully and maliciously to injure the

Plaintiffs. The parties do not dispute that the Defendant found the wherewithal to build the

residence that, although it contained elevation changes to the plans, was a home on the Property.

Thus, there is evidence that Defendant did not fraudulently take the Plaintiffs' earnest money

with no intention ever to build a residence on the Property. Accordingly, the court will DENY

the Plaintiff's motion for summary judgment on their Section 523(a)(6) claim.

### V.      Conclusion

As summarized *supra*, the court concludes that it will DENY the Defendant's motion for

summary judgment. The court will also DENY the Plaintiffs' cross motion for summary

judgment on their claims.

A separate order will enter.

# # #