

**SO ORDERED.**
**SIGNED this 13th day of January, 2016**


**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

(Not for publication. Case has limited precedential value.)


**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

In re:

          No.   1:13-bk-13188-SDR
          Chapter 7

VINCENT PERRY MORSE and
MARY LYNN MORSE

       Debtors;


MONFORD C. RICE, II and
REBECCA RICE

       Plaintiffs

v.

          Adversary Proceeding
          No.   1:13-ap-01110-SDR

VINCENT PERRY MORSE,

       Defendant

1

Appearances for the Plaintiffs,
     Scott Raymond Maucere
     6708 Heritage Business Court, Chattanooga, Tennessee
     Mi W. Belvin
     6708 Heritage Business Court, Chattanooga, Tennessee

Appearances for the Defendant/Debtor
     Buddy B. Presley, Jr.
     1384 Gunbarrel Road, Suite B, Chattanooga, Tennessee

## MEMORANDUM

Monford C. Rice, II, and Rebecca Rice (collectively "Plaintiffs") seek a judgment against Vincent Perry Morse ("Defendant" or "Debtor"), for $223,500, which they contend is nondischargeable debt pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). In addition, the Plaintiffs object to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(3), 727(a)(4)(A), and 727(a)(5). The Plaintiffs further seek treble damages, interest, attorney's fees, and costs. A trial was held in the adversary proceeding on November 3, 4, and 6, 2015.

The Plaintiffs' claims arise from a construction contract they entered into with North Chattanooga Enterprises ("NCE"), a limited liability company whose operations were controlled by the Debtor. The contract contained a condition entitling the Plaintiffs to review and accept the final construction elevations. The Plaintiffs rejected the elevations provided by the Debtor and terminated the contract before construction had begun. After the Debtor refused to return their earnest money, the Plaintiffs discovered that the Debtor had spent it for business or personal expenses within days of their delivering the money to the Debtor's agent.

The Debtor's defense is that the Plaintiffs did not understand the changes that he made to the contract during their negotiations. He contends that his addition of a contract term providing that the earnest money was payable directly to him allowed him to use the money however he

2

liked. Thus, the Debtor maintains that he had a reasonable basis for believing that he did not

have an obligation to return any money to the Plaintiffs in the event they did not approve the

elevations and wanted out of the contract.

The court has considered the pleadings filed in this adversary proceeding, the testimony

and exhibits presented at the three day trial, the arguments of counsel, and the applicable case

law and statutory authorities cited by the parties in their briefs. For the reasons set out below, the

court finds that the Plaintiffs proved a claim under 11 U.S.C. §§ 523(a)(4) and (a)(6) but failed to

prove their remaining claims under 11 U.S.C. §§ 523(a)(2)(A), 727(a)(3), 727(a)(4)(A), and

727(a)(5). The court finds that the Plaintiffs are entitled to a judgment in the amount of $19,500

plus reasonable attorney's fees and costs. The court will hold a separate evidentiary hearing on

the appropriate amount of attorney's fees and costs.

The court bases the foregoing rulings on the following findings of fact and conclusions of

law made in accordance with Fed. R. Bankr. P. 7052.

## I.    Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). These

are core matters regarding the discharge of the Debtor and the dischargeability of debts owed to

the Plaintiffs. The parties have also consented to this court entering a final order. (Doc. No. 22,

Scheduling Order).

## II.    Facts

### A.  Background Facts

The Debtor filed his Chapter 7 voluntary bankruptcy petition on June 28, 2013. (Bankr.

Case No. 1:13-bk-13188-SDR, Doc. No. 1). The Plaintiffs filed this adversary proceeding on

September 24, 2013. (Doc. No. 1, Complaint).[1]

The Debtor, an individual resident of Hamilton County, Tennessee, is the owner and operator of Deck Masters, Inc. ("Deck Masters"). (Testimony of Vincent Morse, Nov. 6, 2015, at 9:56:05). The Debtor is also an active member of NCE which he owns with Leslie Fox. (Testimony of Vincent Morse, Nov. 6, 2015, at 9:59:14). No corporate documents evidencing operating agreements, minutes, or resolutions were entered into evidence. The accounting records provided as evidence showed that Mr. Morse's account in his name and the Deck Masters' account were used interchangeably by him without regard to entity or business or personal use. (Tr. Ex. No. 29). In addition to operating under the names Deck Masters and NCE, the Debtor also used Perry Development as a trade name.

### B.  The Agreement Between the Parties

On May 26, 2011, the Rices contracted with NCE for the purchase of two lots and a personal residence to be built on lots 25 and 26 in the Perry Run subdivision, located at 840 Dallas Road, Chattanooga, Tennessee (the "Property") for $390,000. (Tr. Ex. No. 2, p. 1). The residence was to be a semi-custom new home and construction had not yet begun. Although the Rices would obtain financing for the purchase price, it was the seller's responsibility to obtain financing for construction of the home. The document evidencing the parties' agreement was entitled "New Construction Purchase and Sale Agreement" ("Sale Agreement"). *Id.*

In addition to the nine-page Sale Agreement, which was prepared on a form used by the Tennessee Association of Realtors ("TAR"), the parties initialed and attached Exhibits A and B. *Id.* at 10-12. Exhibit A contained additional terms of the parties' agreement numbered 1-22. *Id.*

---

1  All docket entry references refer to docket entries pertaining to Adversary Proceeding No. 1:13-ap-01110-SDR, unless otherwise noted.

at 10-11. Number 22 on this list provided as follows: "Note Driveway in front of garage will be 24 feet wide and not sure of depth until final plotting house and garage and final response on alley from City." *Id.* at 11. Exhibit B was a drawing of the house and lot. *Id.* at 12. Mr. Rice testified that Exhibit B represented where the house would sit on the property but he understood the location of the house on the property might be subject to change. (Testimony of Monford Rice, II, Nov. 3, 2015, at 11:22:04). The drawing showed the access from the road was the back of the house. The front of the house overlooked a steep slope down to Dallas Road. The lawn in front of the house was created by filling in the area in front of the house and by building a retaining wall. The location of the house was important to the Rices because they wanted a yard for their dogs and a large enough yard so that the doors on the front of the house would open onto the yard. (Testimony of Natalie Chalverus, Nov. 4, 2015, at 9:36:16). Mr. Rice testified that the lines shown on Exhibit B running across the lot between the house and Dallas Road represented the retaining wall. (Testimony of Monford Rice, II, Nov. 3, 2015, at 11:23:25).

The Plaintiffs and the Defendant went through at least one revision and two counteroffers of their agreement before coming to their final terms. In the revision, a special provision was added as Paragraph 28 of the Sale Agreement, providing that, "This offer is subject to the following: . . . Builder/Seller to provide a front and rear elevation of the house, breezeway, and garage. Elevation must be acceptable to buyers." (Tr. Ex. No. 2, p. 8). The Sale Agreement was signed by the Rices on May 19, 2011. *Id.* at p. 9.

The Sale Agreement provided in Paragraph 3 that Coldwell Banker Pryor Realty, Inc., would be the "Holder" of a deposit of $5,000 defined as the "Earnest Money." (Tr. Ex. No. 2, p. 3). The remainder of Paragraph 3 provided:

5

3.    **Earnest Money.**

**. . . .**

**In the event that the Seller is the holder of the Earnest Money, Buyer acknowledges that said funds may be used for the construction of Property.** In the event any Earnest Money check is not honored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller. Buyer shall have (1) day after notice to deliver good funds to Holder. In the event Buyer does not timely deliver good funds, Seller shall have the right to terminate this Agreement upon written notice to Buyer via the Notification form or equivalent written notice. Earnest Money is to be deposited promptly after the Binding Agreement Date or the agreed upon delivery date in this Earnest [*sic*] paragraph or as specified in the Special Stipulations paragraph contained at paragraph 29 [*sic*] herein. Holder shall disburse Earnest [*sic*] only as follows:

>    (a) at closing to be applied as a credit toward Buyer's Purchase Price;

>    (b) upon a written agreement signed by all parties having an interest in the funds;

>    (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the Earnest Money;

>    (d) upon a reasonable interpretation of the Agreement; or

>    (e) upon the filing of an interpleader action with payment to be made to the clerk of the court having jurisdiction over the matter.

Holder shall be reimbursed for, and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Holder. No party shall seek damages from Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under this Earnest Money paragraph. Earnest Money shall not be disbursed prior to fourteen (14) days after deposit unless written evidence of clearance by bank is provided.

*Id.*

The Sale Agreement also contained the following additional relevant provisions:

4.    **Limitations.**    The home shall be constructed in accordance with good building practices and substantial accordance with the plans and specifications selected and approved by the Buyer. Seller expressly reserves the right to make such changes or substitutions in the construction of the home:

> (a) as may be required, authorized, or approved by governmental agencies
> having jurisdiction therefore, without the Buyer's consent;
>
> (b) as Seller may deem appropriate so long as materials of equal or better
> quality are used, without the Buyer's consent; and/or
>
> (c) as may be otherwise reasonably required as long as changes which
> affect the aesthetics or livability of the home shall be subject to the
> Buyer's written approval.

. . . .

> **25.    Default.**    Should Buyer default hereunder, the Earnest Money shall be
> forfeited as damages to Seller and shall be applied as a credit against Seller's
> damages. Seller may elect to sue, in contract or tort, for additional damages or
> specific performance of the Agreement, or both. Should Seller default, Buyer's
> Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in
> contract or tort, for damages or specific performance of this Agreement, or both.
> In the event that any party hereto shall file suit for breach or enforcement of this
> Agreement (including suits filed after Closing which are based on or related to the
> Agreement), the prevailing party shall be entitled to recover all costs of such
> enforcement, including reasonable attorney's fees.

*Id.* at p. 3-4, 8.

After receiving a copy of the Sale Agreement signed by the Rices, the Defendant, through

his real estate agent, Caroline Outlaw, prepared and submitted to the Rices a counteroffer

("Counteroffer No. 1"), which provided that "[e]arnest money is 5% of purchase price paid to the

builder." (Tr. Ex. No. 3). Thus, this counteroffer changed the proposed amount of earnest money

from $5,000 to 5% of the purchase price, or $19,500, and provided that the money would be paid

directly to the "builder." Counteroffer No. 1 also provided that "[a]ll other terms and conditions

of the original attached Purchase and Sale Agreement are acceptable to the undersigned." Mr.

Morse signed Counteroffer No. 1 on May 24, 2011. *Id.* There was nothing in the contract that

reflected that the Debtor was deleting the terms of Paragraph 3 other than the requirement of an

earnest money payment of 5% directly to him.

7

The Rices rejected Counteroffer No. 1 and made a second counteroffer ("Counteroffer No. 2"), which repeated that "[e]arnest money is 5% of purchase price made payable to builder," but added an identification of the builder as Vincent Morse and specified that the earnest money "shall be refundable." (Tr. Ex. No. 4). The Rices wanted to make sure that the earnest money was refundable because they had not seen the final plans or location of the house when the counteroffer was made. Counteroffer No. 2 also provided that "[a]ll other terms of Paragraph 3 Earnest Money shall remain the same." *Id.* The Rices signed Counteroffer No. 2 on May 25, 2011, as individuals, and Mr. Morse signed it the following day without any designation that he was signing as a corporate representative. *Id.* The parties' final agreement is reflected in the revised "Sale Agreement," "Exhibit A," "Exhibit B," and "Counteroffer No. 2." The court will refer to all of these documents collectively as the "Agreement."

The Rices delivered a check dated May 27, 2011, for the earnest money in the amount of $19,500. (Tr. Ex. No. 6). The check was made payable to Mr. Morse personally as set out in Counteroffer No. 2, which complied with the Defendant's request in Counteroffer No. 1 that the earnest money be paid to the builder. *Id.* The receipt of the earnest money was reflected as received on the ledger of Deck Masters on June 2, 2011. (Tr. Ex. No. 29, Ledger of Deck Masters Account, p. 8).

### C. Breach of the Agreement

### 1. Approval of the Elevations

The Agreement provided that it was subject to the "Builder/Seller . . . provid[ing] a front and rear elevation of the house" and that such elevations "must be acceptable to buyers." (Tr. Ex. No. 2, p. 8). On June 4, 2011, the Rices sent an email to Kenny Slayton, whom Mr. Morse

8

identified as the "project manager" for Deck Masters. (Trial Ex. No. 30, p. 1; Testimony of

Vincent Morse, Nov. 6, 2015, at 10:36:12). The email informed Mr. Slayton that the Rices' loan

application had been sent to underwriting, which would "hopefully . . . produce the approval

letter" that Mr. Morse's lenders were "looking for." (Tr. Ex. No. 14, p. 1). The email also

addressed some changes to the plans. *Id.* On June 8, the Rices' real estate agent, Natalie

Chalverus, confirmed that "Vincent's house drawing man" was working on the front and rear

elevations. (Tr. Ex. No. 15). On June 10, an email from Joseph Ingram, who provided the

drawings of the house location and elevations, was forwarded to Mrs. Rice. (Tr. Ex. No. 16). The

email included attached documents that were admitted into evidence and included drawings of

the proposed site plan, proposed right elevation, and proposed front and rear elevations for lots

25 and 26. (Tr. Ex. Nos. 7, 16). The drawings show a strip of yard of approximately seven feet

wide running around the house. (Tr. Ex. No. 7, p. 1-2).

The Rices responded to the Defendant's agents with changes to the proposed elevations.

(Testimony of Monford Rice, II, Nov. 3, 2015, at 10:58:23; Testimony of Rebecca Rice, Nov. 3,

2015, at 4:12:07). On June 13, Ms. Outlaw responded that "they are making the corrections that

[Mr. Rice] requested." (Tr. Ex. No. 30, p. 5). Also on June 13, Mrs. Rice asked Ms. Outlaw to set

up a meeting with Mr. Slayton so that she could make color selections for the house. *Id.* The

following day, Ms. Outlaw replied to Mrs. Rice that Mr. Slayton would "schedule an

appointment with [Mrs. Rice] to go over selections as soon as the construction loan is approved,"

which Ms. Outlaw said, "should be about 2 weeks." *Id.* at 11.

On June 22, Mr. Rice followed up with Ms. Chalverus about the delay in meeting with

Mr. Slayton and also noted that he had not yet seen floor plans. *Id.* On July 3, the Rices again

emailed Ms. Outlaw about the status of the construction of their home and specifically about whether financing had been obtained to begin construction. *Id.* at 17. On July 5, Ms. Outlaw forwarded an email to Mrs. Rice from Mr. Morse's banker who said that he was meeting Mr. Morse that day and did not "foresee any issue[s]." *Id.*

On July 19, Ms. Outlaw forwarded an update that the bank was still waiting on an appraisal, but she noted that the appraiser "had the plans and [Mr. Morse's] phone #." *Id.* at 20. The banker also indicated that the paperwork needed to be prepared but again reiterated that he did not "foresee any issues." *Id.* Ms. Outlaw also assured the Rices that she had spoken with Mr. Morse the day before and they were "ready to pour footers as soon as" the loan was closed. *Id.*

On August 2, the Rices emailed Ms. Chalverus complaining that they had not gotten any response from Ms. Outlaw or Mr. Slayton. *Id.* at 24. The Rices noted that they had recently gone to the site but that no construction had begun other than some "clearing out." *Id.* The Rices also noted that "[t]hey haven't done anything for us that was in our contract as far as house plan approval, elevations, etc." *Id.* For the first time, the Rices began to question whether the Defendant wanted out of the contract, explaining that "[i]t appears to us that they want us to get out of our contract with them." *Id.*

After speaking with the Defendant and Mr. Slayton, Ms. Outlaw responded to the Rices the same day. *Id.* at 26. In an email dated Tuesday, August 2, 2011, Ms. Outlaw apologized for "the lack of communication" and explained that "[t]he construction loan ended up being delayed." *Id.* She explained that the construction loan had closed the prior Friday and that on Monday, workers "cleaned out a lot of trees and reshot the elevation." *Id.* Ms. Outlaw also told the Rices that she had spoken with Mr. Slayton "regarding the plans, elevations and timeline."

10

*Id.* In response, Mrs. Rice sent an email on August 3 to all involved containing "the elevations with comments." *Id.* at 28.

On August 7, Mr. Ingram sent an email entitled "Revised Lot Plan" to Mr. Slayton, who forwarded it to Mrs. Rice. *Id.* at 32-33. The revision did not contain Mr. Rice's changes but did reflect a new change. The house had been relocated on the lot and the retaining wall had been moved so that there was no lawn on the front of the house. This shift made the doors unusable as a means of entering the house. The Rices informed their real estate agent that they did not approve of the revisions. *Id.* at 33. In an email to Ms. Chalverus, Mrs. Rice wrote:

> Yard is so tiny! They moved the house to the right and the retaining wall is next to the house instead of the setback line on Dallas. Most of the left of lot is unusable. We are sending our thoughts to them and including you. Just wanted to let you know that this doesn't work for us.

*Id.* The Rices then sent an email on August 7 to Perry Development, Mr. Slayton, Ms. Outlaw, and Ms. Chalverus, noting their problems "with the way the house, deck, retaining wall, and yard are currently situated" and concluding that "we cannot accept the current plan." *Id.* at 40.

On August 8, Mrs. Rice emailed Ms. Chalverus and reported that she had spoken with Mr. Slayton, who was "looking into taking the deck from between the buildings and putting it on the back of the house." *Id.* at 35. According to Mrs. Rice, Mr. Slayton told her that "they would send another drawing." *Id.* However, this proposal did not address the yard space Mrs. Rice wanted for her dogs. *Id.* She asked Ms. Chalverus, "What are our options. We are about ready to through [*sic*] in the towel on this house." *Id.* Ms. Chalverus replied later that day that she thought the Rices should "wait and see what he comes up with. If you are not happy, then I think you should back out, get back your earnest money and move on to another house." *Id.* at 38.

On August 9, 2011, the Rices terminated the contract by signing and delivering to Mr.

11

Morse's agent a form entitled "Earnest Money Disbursement and Mutual Release of Purchase and Sale Agreement." (Tr. Ex. No. 5). On that form, the Rices indicated that the earnest money was to be disbursed because "Buyers are in agreement that the revised house [and] lot elevations are not acceptable." *Id.* The Defendant refused to return the earnest money. (Testimony of Vincent Morse, Nov. 6, 2015, at 11:28:20).

On August 15, Ms. Chalverus emailed Ms. Rice and told her that "[a]pparently, the seller revised the elevations because the sewer line made construction [*sic*] the retaining wall more expensive. He now claims he can build to the original specification and elevations and have it done by the original closing date. . . ." (Tr. Ex. No. 30, p. 46). The Rices did not accept the proposal. At trial, they presented evidence that the construction could not have been completed in the approximately three months that remained in the original schedule. The Defendant did eventually build a house on the lot and sold it to a different buyer for $445,000. (Testimony of Natalie Chalverus, Nov. 4, 2015, at 10:16:55).

### 2.  Disbursement of the Earnest Money

With respect to the representations regarding the earnest money and its subsequent disbursement, the Defendant admitted at trial that he did not keep the Rices' earnest money in an escrow account but instead deposited it into the corporate account for Deck Masters. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:52:15, 10:59:44, 11:00:50 ). He testified that it was his standard procedure not to hold earnest money in a separate account but to use the money to recoup operating expenses. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:52:53-10:53:10). The Defendant testified that he never intended to hold the Rices' money in any sort of separate account. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:49:45). He testified that when he

12

signed the Agreement with the Rices he intended to deposit the money into Deck Masters'

corporate account and use it for general operating expenses. (Testimony of Vincent Morse, Nov.

6, 2015, at 11:01:11-11:02:45).

      The Defendant testified that the statement in the Agreement that the earnest money was

refundable was a mistake and that he never would have entered a contract that required him to

refund the money for any reason. (Testimony of Vincent Morse, Nov. 6, 2015, at

9:50:36-9:52:50, 10:48:48). He explained that he had never returned someone's earnest money.

(Testimony of Vincent Morse, Nov. 6, 2015, at 10:49:45). He testified that he did not believe the

limitations on disbursement contained in the Agreement applied to him because he did not

consider himself the holder of earnest money. (Testimony of Vincent Morse, Nov. 6, 2015, at

10:57:55-11:00:04).

      Jack London, a Certified Public Accountant, submitted an expert report and testified as

an expert at trial concerning the disbursement of the earnest money. (Tr. Ex. No. 26). Among

other items, Mr. London examined the general ledger for Deck Masters and the QuickBooks files

for NCE. (Tr. Ex. Nos. 26, 27, 29). Mr. London confirmed that the Defendant deposited the

Plaintiffs' earnest money check for $19,500 into a Deck Masters' account on June 2, 2011. (Tr.

Ex. No. 26, p. 8). The general ledger shows that the Rices' earnest money was commingled with

other funds including NCE shareholder distributions and loan proceeds. (Tr. Ex. No. 29, p. 8-13).

The general ledger also shows that, on the day the earnest money was deposited into the account,

the Defendant spent $6,972.19 on payments on loans for other properties, travel expenses, and

personal expenses. (Tr. Ex. No. 29, p. 8). On June 3, the Defendant spent another $494 on

vehicle expenses and personal insurance. *Id.* On June 6, he spent $4,900.74 on a note payable,

13

Princess Cruise tickets, airline tickets, office supplies, and meals at a variety of restaurants. *Id.* A

deposit was made on June 9, 2011, that is denoted as "Loan/Fox." *Id.* at 9. The ledger never

showed a negative balance in 2011 but did show a balance as high as $231,000 on June 24, 2011.

*Id.* at p. 10. However, on August 9, 2011, the day the Plaintiffs requested the return of their

earnest money, there was only $2,421.61 in the Deck Masters' account. *Id.* at 13. The account

remained at approximately that balance for at least another week. *Id.*

After examining the accounting records for Deck Masters and NCE, Mr. London was

only able to identify five checks which the Defendant's records allocated to 840 Dallas Road that

were written between the date the earnest money was deposited and the date the contract was

terminated. (Tr. Ex. No. 26-27). With the exception of one check written from a Deck Masters'

account for $24.05 dated August 4, 2011 payable to TN American Water, none of the other

disbursements were coded in the Defendant's QuickBooks records as related to 840 Dallas Road

at the time they were written in the summer of 2011. *Id.* The expense categories for those checks

were not charged to 840 Dallas Road until 2012, and those notations in the Defendant's records

were modified several times thereafter. *Id.* A $1,500 check payable to Joseph Ingram had a

QuickBooks notation that it was for "Drawings for Lot 9 and 10" (which was another

designation for the Property), and there was corroborating evidence that drawings specifically

related to 840 Dallas Road were done at that time. (Tr. Ex. No. 27).

### III. Analysis

### A. The Plaintiffs' Section 523(a) Claims

11 U.S.C. § 727 provides for the discharge of an individual from any specific debt unless

that debt is excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(a)-(b). The

14

creditor must prove by a preponderance of the evidence that its debt is nondischargeable under

11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 659 (1991).

Exceptions to discharge are narrowly construed in the debtor's favor. *See Monsanto Co. v.*

*Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004). The Plaintiffs have raised

three grounds on which they ask the court to find that the Debtor's obligations to them are not

dischargeable. They are section 523(a)(2)(A), (a)(4) and (a)(6).

**1.      Section 523(a)(2)(A)**

11 U.S.C. § 523(a)(2)(A) prohibits discharge of debt based on "(A) false pretenses, a

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition. . . ." The Sixth Circuit has held that to demonstrate nondischargeability

pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the
> time, the debtor knew was false or made with gross recklessness as to its truth; (2)
> the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the
> false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998). A creditor bears the burden of demonstrating these elements by a preponderance of the

evidence. *Id.* at 281 (relying on *Grogan*, 498 U.S. at 291, 111 S. Ct. at 661).

This claim for misrepresentation presents an unusual set of facts because the Defendant

never spoke to the Plaintiffs until after litigation between them had begun. The Defendant never

sent the Plaintiffs any written communications except Counteroffer No. 1 to the Agreement,

which was presented to the Plaintiffs indirectly through the parties' real estate agents. The

representations upon which the Plaintiffs rely are the terms of the Agreement itself, which the

15

Plaintiffs construed in the context of their discussions with their real estate agent, Ms. Chalverus.

The Plaintiffs' version of the facts is that Ms. Chalverus suggested that they look at the Perry Run development as a place for their new home in Chattanooga. The Plaintiffs liked what they saw, and after looking at a model home, they authorized Ms. Chalverus to enter into negotiations with Mr. Morse's agent, Ms. Outlaw, for a contract to construct a house on two lots in the development. Portions of the lot were steep, and the Plaintiffs wanted to make sure that the house was placed in such a manner that there would be a yard both beside and in front of the house. The front of the house would overlook the slope. The plans they looked at had doors on the ground floor of the front of the house, and the Plaintiffs wanted to be able to go in and out through those doors and to have a run for their dogs in front of the house. To accommodate this request, a retaining wall would have to be constructed in front of the house to create some level space. The location of the house on the lot was in question because the location of the sewer lines had not yet been finalized when they first discussed a contract. The Plaintiffs decided to move forward with negotiating the contract, but they did not want to commit to the purchase until they knew the final location of the house and how its location would impact the yard. The Plaintiffs' first draft offered a small amount of earnest money, $5,000, which would be held by a realtor in an escrow account.

The Defendant did not accept the Plaintiffs' initial offer. He testified that he typically charged 5% of the purchase price as earnest money for a custom home. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:46:52). Ms. Outlaw testified that the Defendant wanted this money paid to him directly. (Testimony of Caroline Outlaw, Nov. 4, 2015, at 2:07:08). The Defendant testified that he requested the earnest money be paid directly to him, that he made this change on

16

all of the contracts for houses in Perry Run, and that Ms. Outlaw was aware of this "protocol." (Testimony of Vincent Morse, Nov. 6, 2015, at 9:48:25). He also advised her to change the name of the Seller from Perry Development to North Chattanooga Enterprises. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:40:55). Ms. Outlaw made the changes Mr. Morse suggested and sent Counteroffer No. 1 to Ms. Chalverus. (Tr. Ex. No. 3).

The Plaintiffs did not accept Counteroffer No. 1 and instead made Counteroffer No. 2. It is at this point that the parties' understanding of the contract begins to diverge. The Plaintiffs had previously inserted a provision into the Sale Agreement providing that it was subject to their approval of the final plans and elevations. (Tr. Ex. No. 2, ¶28). In Counteroffer No. 2, the Plaintiffs agreed to increase the earnest money to 5% of the purchase price and agreed to pay it directly to the "builder-Vincent Morse." (Tr. Ex. No. 4). After checking with Ms. Chalverus that their earnest money was refundable and that it would be held in escrow pursuant to Paragraph 3, they also added a clarifying provision that the earnest money "shall be refundable." (Tr. Ex. No. 4; Testimony of Monford Rice, II, Nov. 3, 2015, at 9:56:25). They also specifically stated that all of the remaining terms of the earnest money paragraph would remain in effect. (Tr. Ex. No. 4). When the Defendant signed the Agreement with these terms, the Plaintiffs believed that they had an absolute right to get out of the contract if they did not find the final floor plans and elevations acceptable. They also believed that if they terminated the Agreement they would receive their earnest money back, and they believed that if their earnest money was disbursed from the escrow account it would be used to construct their house.

The Defendant signed the Agreement but stated at trial that he had not noticed the Agreement had been further changed to make the earnest money refundable and to impose

limitations on disbursement in Paragraph 3. Mr. Morse testified that, to the extent that those provisions were included in the Agreement, it was a mistake and that he would never have agreed to a contract that allowed someone to get their money back for any reason. (Testimony of Vincent Morse, Nov. 6, 2015, at 9:50:37-9:52:46).

The court does not find the Defendant's testimony that "he just missed this provision" to be credible. The Defendant also testified that he had already incurred development expenses for the subdivision he wanted to recoup. It was his practice in building this subdivision to require the earnest money to be paid to him personally. (Testimony of Vincent Morse, Nov. 6, 2015, at 9:48:20, 10:05:20). He also acknowledged that he used the TAR form contract for all of his Perry Run houses and that he had used that form contract many times. (Testimony of Vincent Morse, Nov. 6, 2015, at 9:49:23). He was familiar with its restrictions on disbursement. He tried to avoid those restrictions by inserting a provision that the money would be directly paid to the builder instead of to the Holder as defined in the Agreement. That change would allow him to receive the money and deposit it into the Deck Masters' operating account, which he could use as he saw fit under his interpretation. The Plaintiff's insistence on "refundable" and the other provisions of Paragraph 3 remaining in effect significantly changed the Defendant's "protocol." It was an important provision to the Defendant that the court does not believe that he was likely to miss. The provisions also appeared on the signature page to the Agreement.

Although the Defendant was evasive in responding to questioning about what he believed was the extent of his authority to use the earnest money, the court infers from the responses he did give that the only way he thought that the Rices could get their money back was if he failed to build a house for them. The court believes that the Defendant had every intention of building

18

the Plaintiffs a house, although it might not be built on time and would not be exactly what they wanted. Those were matters that the Defendant thought he could work out after the process had started. However, the Defendant had no intention of giving the earnest money back and, in fact, intended to make it hard on the Plaintiffs to get their earnest money back.

From a contract liability perspective, the Defendant was an experienced builder. He had built a number of houses, worked with Ms. Outlaw for almost a year, and used the same TAR form contract on many of the houses he had built. He was no novice to negotiations to build a house or to using TAR contracts. Despite the Defendant's testimony at trial that he understood the contract obligations differently than the Plaintiffs, the court finds that the Agreement was clear that it was subject to the Plaintiffs' approval of the final elevations. The court also finds that, when those elevations were not acceptable to the Plaintiffs, the Agreement allowed the Plaintiffs to walk away and request a return of the earnest money. The court finds that the Defendant breached the Agreement when he refused to return the earnest money and disbursed the money contrary to the provisions of paragraph 3 of the Agreement. As damages, the Plaintiffs are entitled to a return of their earnest money as well as their costs and reasonable attorney's fees in recovering that money.

However, a contract breach, even an intentional one, does not result in a nondischargeable debt unless the Defendant knowingly made false representations about the handling of the earnest money with the intent of deceiving the Plaintiffs into giving him the money and the Plaintiffs justifiably relied on those misrepresentations. Because there were no face to face representations, proof of what the Defendant directed his agents to represent to the Plaintiffs and their agent is critical to the Plaintiffs' case. The proof on this element, however, is

19

not clear.

The Plaintiffs admitted that they were concerned about the provisions in the counteroffers providing that the earnest money would be held by the builder. (Testimony of Monford Rice, II, Nov. 3, at 9:56:00). However, they discussed the matter with *their* agent, Ms. Chalverus, not with the Defendant or his agent, and it was Ms. Chalverus who provided initial assurances to the Rices. Mr. Rice testified that they were concerned when the earnest money amount increased because they had never had to pay that much earnest money before but that Ms. Chalverus told them it was "normal" to pay that much for a semi-custom home. (Testimony of Monford Rice, II, Nov. 3, 2015, at 9:55:58). He stated that they were "leery" when they were asked to pay their earnest money to an individual but that Ms. Chalverus told them that in "some instances it does happen." (Testimony of Monford Rice, II, Nov. 3, 2015, at 9:56:05). Because the Plaintiffs were still leery, they sent, or asked Ms. Chalverus to send, an email to Ms. Outlaw confirming that the earnest money would be held in an escrow account and was "totally refundable." (Testimony of Monford Rice, II, Nov. 3, 2015, at 9:56:30). Mr. Rice testified that Ms. Outlaw told them "Yes, it is totally refundable and it shall be treated as per Paragraph 3 [in the contract]." (Testimony of Monford Rice, II, Nov. 3, 2015, at 9:56:47). Mr. Rice was not specific as to whether that statement was made to him in person by Ms. Outlaw, relayed to them by Ms. Chalverus, or written in an email. No email was offered at trial regarding the earnest money being placed in an escrow account despite numerous other emails being offered regarding what happened after the Agreement was executed.

When Ms. Chalverus was questioned, she was not asked about the email or her discussion of the matter with Ms. Outlaw but was instead questioned about earnest money generally.

(Testimony of Natalie Chalverus, Nov. 4, 2015, at 10:05:45). She testified that she would have "thought that the money would have been held in a trust account so that it was available in case the Rices decided to terminate the Agreement," but she did not testify about any representation that she received from Ms. Outlaw. (Testimony of Natalie Chalverus, Nov. 4, 2015, at 10:06:11). She later testified that she learned from Ms. Outlaw that Mr. Morse never bothered to learn the terms of the contract, but the date she was told that by Ms. Outlaw appears to be after the Rices had terminated the contract. (Testimony of Natalie Chalverus, Nov. 4, 2015, at 11:24:42).

Ms. Outlaw testified that she communicated the offers from the Rices to Mr. Morse. (Testimony of Caroline Outlaw, Nov. 4, 2015, at 2:06:37). The only direction from Mr. Morse that she acknowledged receiving was when he told her to have the money paid to him directly. However, when asked why, Ms. Outlaw testified that the earnest money was paid to Mr. Morse because he was the seller. (Testimony of Caroline Outlaw, Nov. 4, 2015, at 2:07:05). She was not asked about any representations or assurances that she might have made to the Rices or to Ms. Chalverus about what was going to be done with the earnest money. Likewise, she did not testify about any specific conversations she had with Mr. Morse regarding the changes to the Agreement in Counteroffer No. 2.

When Mrs. Rice was questioned about what Mr. Morse did that she thought was untruthful, she stated that he did not return the earnest money and that he used it for something other than the property. (Testimony of Rebecca Rice, Nov. 3, 2015, at 4:42:02).

When all of the testimony is reviewed, it is apparent that the Rices relied on their own agent's representations regarding what the Agreement included and what Ms. Outlaw said. The Plaintiffs have failed to make the critical connection between the Defendant's representations to

21

Ms. Outlaw and her communications to the Rices either directly or indirectly through Ms.

Chalverus. It was the Plaintiffs' burden to prove by a preponderance of the evidence that Mr.

Morse knowingly made a false representation with the intent to defraud them, and the court finds

that the Plaintiffs have not met that burden.[2] To the extent that the Plaintiffs relied on

representations, the proof indicates that they relied on the explanations given to them by their

own real estate agent and her interpretation and assumptions regarding Ms. Outlaw's

understanding of Mr. Morse's intentions with respect to the Agreement. Given these findings, the

court accordingly finds that the Plaintiffs have failed to prove the element of reliance on a

representation made by the Defendant under 11 U.S.C. § 523(a)(2)(A). Therefore, the debt owed

to them by the Defendant is dischargeable based on their objection to its discharge under section

523(a)(2)(A).

### 2.    Section 523(a)(4)

Once the Defendant had the earnest money, he did not use the money for construction of

the Plaintiffs' house. The Plaintiffs contend that this misuse of the earnest money was

embezzlement and that their loss of the money is a nondischargeable debt. 11 U.S.C. § 523(a)(4)

states in relevant part: "A discharge under section . . . 727 of this title does not discharge an

individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity,

embezzlement, or larceny . . . ." 11 U.S.C. § 523(a)(4).   Federal common law will determine the

---

2  There was a lot of other testimony about the construction start date and the time needed to
complete as being representative of other misrepresentations made by the Defendant in the
Agreement. The court finds that the Plaintiffs did not rely on representations regarding the
construction completion date when giving up the earnest money. In the court's view, the
Plaintiffs were concerned that they not lose their earnest money in the event that the plans for the
house did not meet their expectations, but they did not rely on the construction completion date
when deciding to pay the earnest money.

meaning of the terms in section 523(a)(4). *See SmithKline Beecham Corp. v. Lam (In re Lam)*, No. 06-68805-MGD, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988) (other citations omitted)).

The Sixth Circuit has explained that:

> [f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), abrogated on other grounds as explained in *National Dev. Servs. v. Denbleyker,* 251 B.R. 891 (Bankr. D. Colo. 2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982) and *Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 295 (1895) and citing *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). To demonstrate embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Cash America Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).

With respect to this last element- whether the "circumstances indicate fraud-" the Sixth Circuit has described what type of fraud must be shown:

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or *intentional* wrong." Accordingly, embezzlement claims under § 523(a)(4) require "proof of the debtor's fraudulent intent in taking the [creditor's] property." As the *Brady* definition suggests, the debtor's fraudulent intent may often be shown by circumstantial evidence.

23

*In re Fox*, 370 B.R. at 116 (quotations and citations omitted). Like fraud and misrepresentation under 523(a)(2), this claim requires a showing of specific intent to permanently deprive a party of his or her property. "[M]ere conversion does not rise to the level of embezzlement or larceny under 523(a)(4)." *In re Cross*, No. 08-50531, 2009 WL 981900 at *4 (Bankr. E.D. Tenn. Apr. 13, 2009) (citing *In re Wilson*, 114 B.R. 249, 252 (Bankr. E.D. Cal. 1990)). In *In re Wilson,* the court held the debt to be dischargeable because the plaintiff failed to provide the court with "any significant evidence (direct or circumstantial) regarding the [d]ebtor's actual state of mind at the time the monies were so converted." *Wilson*, 114 B.R. at 252. Circumstantial evidence of fraud is sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent intent. *In re Fox*, 370 B.R. at 116-117. Embezzlement does not require the existence of a fiduciary relationship. *See King v. Spivey (In re Spivey)*, No. 09-3028, 2010 WL 3980132, at *11 (Bankr. E.D. Tenn. Oct. 7, 2010).

As to the first two elements, the court finds that the Plaintiffs entrusted $19,500 to Mr. Morse and he used those funds for a purpose other than the purpose for which they were entrusted. When they delivered their earnest money check to him pursuant to the Agreement, the terms relating to earnest money expressly set forth limitations on the disbursement of the funds and imposed duties on the holder of those funds. Contrary to those terms, Mr. Morse appropriated the money for a use other than that for which it was entrusted within days of receipt of the funds. In fact, he disbursed the money before the 14-day waiting period set out in Paragraph 3 of the Agreement, before the Rices had approved the final elevations, and before he had even obtained a construction loan. Except for possibly $1,500 that was spent on drawings for the property, the Defendant spent the rest of the earnest money in ways that violated the terms of the Agreement.

24

The testimony of the Plaintiffs' expert, Jack London, showed that the Defendant spent the earnest money on a number of personal and business expenses including meals, airline tickets, cruises, office supplies, and notes payable.

As for the third element, the court finds that the circumstances surrounding the appropriation of the funds indicate fraud. The Defendant acknowledged that earnest money held by realtors had to be placed in an escrow account by state law. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:51:58). He used a TAR form for his Agreement. He agreed to the restrictions in Paragraph 3. He also admitted that at the time he entered into the Agreement and received the earnest money, he had no intention of giving the Plaintiffs their money back. (Testimony of Vincent Morse, Nov. 6, 2015, at 11:01:11-11:02:45). He testified that he had never given anyone their earnest money back. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:49:45). He said that he wanted the money so that he could recoup his expenses for the development and that he intended to use the money for operating expenses. (Testimony of Vincent Morse, Nov. 6, 2015, at 11:00:49) He also admitted that he had previously stated that not putting the money in an escrow account made it harder for individuals to get their money back. (Testimony of Vincent Morse, Nov. 6, 2015, at 10:54:08). These admissions mean that the Defendant entered into the Agreement by which he received the Plaintiffs' earnest money fully aware that he did not intend to uphold the terms of the Agreement with respect to the earnest money. Moreover, the Defendant's later actions comport with these admissions. He deposited the money into Deck Masters' corporate account and almost immediately began spending the money on other business and personal expenses unrelated to the Plaintiffs' house, including travel expenses, meals, office supplies, and notes payable. Even when he later had significant funds in his account, he made no attempt to return the funds.

The Defendant offered three alternative theories for his behavior. He testified that he did not consider himself a holder of earnest money subject to restrictions in the Agreement. Mr. Morse contended that he was a developer, not a realtor, so he did not believe that he was bound by Paragraph 3 of the Agreement. The court finds that this explanation is not sufficient to overcome the Defendant's pattern of requiring the earnest money to be paid to him in order to avoid any obligation to return the earnest money. He regularly used the TAR form contract, which requires an escrow account and limits the distribution of the funds, so he was familiar with its requirements. He deliberately tried to negotiate those obligations out of the contract but could not. It appears he simply decided to ignore them when they were reinserted into the Agreement by the Plaintiffs.

Second, the Defendant argued that if Paragraph 3 applied, the builder could use the earnest money for construction under the terms of the Agreement. The Agreement did allow the funds to be used for the construction of the Rices' house if the Seller were the holder of the earnest money. (Tr. Ex. No. 2, p.3). Mr. Morse allowed everyone around him to perceive him to be the Seller and the builder. As such he would have been entitled to use the proceeds for construction, but the proof at trial demonstrated that he did not use the money for that purpose. Even his attempts to assign site preparation expenses to this project are suspect. Mr. Morse's record keeping for each project was limited, if not nonexistent. He did not account for expenses contemporaneously and reconstructed his records once a year in order to prepare his tax returns. The court finds his allocation of expenses to this project after litigation with the Rices had begun to be unpersuasive. When questioned specifically about his intent to use the money for general operating expenses and not for construction of the Rices home, he avoided responding and simply repeatedly stated that he had deposited the money into his corporate account which was in the name of party that did not appear

26

anywhere on the Agreement. Although the Defendant may have intended to build the house with funds from another source, he took the earnest money with the intent that he would use it to pay other personal and business expenses while agreeing to a contract provision to the contrary.

The Defendant also argued that he had a reasonable basis for believing that he was entitled to the money because the Agreement was first breached by the Plaintiffs when they terminated the Agreement on August 9, 2011. If they breached first, then he was entitled to keep the earnest money. The court also rejects this explanation because the Defendant spent the Plaintiffs' earnest money long before their termination of the Agreement. The court finds no causal connection between their termination and his misuse of the funds.

Given his evasive testimony, his use of a TAR contract, his experience with realtors, and his practice of insisting on direct payment to himself as the builder to avoid the requirement of an escrow account, the court finds that the circumstances indicate fraud. At the time he misappropriated the earnest money, he did so with intent not to return the money to the Plaintiffs.

The Plaintiffs have shown by a preponderance of the evidence all of the elements of a claim for embezzlement under 11 U.S.C. § 523(a)(4).   Consequently, the Plaintiffs will be awarded a nondischargeable judgment in the amount of $19,500 plus reasonable attorney's fees and costs as discussed in more detail below.

### 3.    Section 523(a)(6)

The elements of the embezzlement prong of section 523(a)(4) are very close to the elements of section 523(a)(6). Plaintiffs also claim that the Defendant willfully and maliciously converted their earnest money. 11 U.S.C. § 523(a)(6) states in relevant part:

> A discharge under section 727. . . of this title does not discharge an individual
> debtor from any debt – . . .

27

(6) for willful and malicious injury by the debtor to another entity
or to the property of another entity . . . .

11 U.S.C. § 523(a)(6).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01

(Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264

B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388

(Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and*

malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury

that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz*

*v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has

addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523

U.S. 57, 118 S. Ct. 974 (1998). As summarized by the Sixth Circuit:

> The Court held that "willful" means "voluntary," "intentional," or "deliberate."
> As such, only acts done with the intent to cause injury – and not merely acts done
> intentionally – can cause willful and malicious injury. The Court explained its
> holding by discussing the importance of context:
>
>> The word "willful" in (a)(6) modifies the word "injury," indicating
>> that nondischargeability takes a deliberate or intentional *injury*, not
>> merely a deliberate or intentional act that leads to injury. Had
>> Congress meant to exempt debts resulting from unintentionally
>> inflicted injuries, it might have described instead "willful acts that
>> cause injury." Or, Congress might have selected an additional
>> word or words, i.e., "reckless" or "negligent," to modify "injury."
>> Moreover, as the Eighth Circuit observed, the (a)(6) formulation
>> triggers in the lawyer's mind the category "intentional torts," as
>> distinguished from negligent or reckless torts. Intentional torts
>> generally require that the actor intend "the *consequences* of an
>> act," not simply "the act itself."

28

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S. Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor

desires to cause consequences of his act, or . . . believes that the consequences are substantially

certain to result from it,' he has not committed a 'willful and malicious injury' as defined under §

523(a)(6)." *In re Markowitz*, 190 F.3d at 464.

Proof of willful behavior must often be demonstrated through the use of circumstantial

evidence. *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that

"willful" behavior can "be indirectly established by the creditor demonstrating the existence of

two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his

conduct would cause injury to those rights." *Id.* As another bankruptcy court in this circuit has

observed, "[t]he willfulness element is designed to separate negligent or inadvertent acts from

deliberate and intentional ones, and to ensure that the conduct in question falls within the ambit

of an intentional tort." *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R.

180, 185 (Bankr. W.D. Mich. 2010).

For the reasons stated above, the court finds that the Defendant intended to cause the

damage to the Plaintiffs. He admitted stating in a deposition that it was harder for buyers to get

their earnest money back if he held it rather than put it in an escrow account. The court finds that

the Defendant intended to have control and use of the money so that, if a buyer wanted out of a

deal, he could use his control of the earnest money as leverage despite what his obligations may

be under the contract. The fact that he ignored additional terms requiring him to return the

money is circumstantial evidence of his intent to keep the money regardless of his right to it. The

court does not find his explanation that he was simply mistaken about the terms of the

Agreement credible. If that had been the case, he could have looked at the contract when the issue arose and refunded the money. Instead, he was unable to repay the money when it was first requested and thereafter took the position that the Rices breached the contract until he filed bankruptcy and sought to discharge their debt. Based on his practice of having the money paid to himself and his statement at his deposition about the reason, the court finds his actions to be willful and malicious. The court finds that the Rices are entitled to a judgment for their loss caused by the Defendant's willful and malicious actions in converting the money. Because the court has already awarded a judgment in the full amount of the earnest money, the court will not add any additional amount to the judgment on account of this claim.

**B.**     **The Plaintiffs' Section 727 Denial of Discharge Claims**

11 U.S.C. § 727 provides that a debtor shall receive a discharge of all his debts, except in certain limited circumstances. The Plaintiffs assert that several of those exceptions to the right of discharge apply to the Debtor. A plaintiff must prove the elements of 11 U.S.C. § 727(a) by a preponderance of the evidence, and courts generally construe section 727(a) liberally in favor of the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see also, Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 373 (Bankr. E.D. Tenn. 2009). The Plaintiffs have alleged three grounds for denial of the Debtor's discharge. The court will discuss each ground separately below.

**1.**     **Section 727(a)(3)**

11 U.S.C. § 727(a)(3) precludes a discharge if:

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Although exceptions to discharge are narrowly construed in the debtor's favor, "'[b]road discretion is vested in the referee to grant or deny a bankruptcy petition based on a determination that books or records are adequate under the terms of the statute and the facts of each case. . . .'" *In re Dolin,* 799 F.2d 251, 253 (6th Cir.1986) (quoting *McBee v. Sliman,* 512 F.2d 504, 506 (5th Cir. 1975)); *see also Monsanto Co. v. Trantham (In re Trantham),* 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004); *CM Temporary Servs., Inc. v. Bailey (In re Bailey),* 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007) ("statute is to be liberally construed in favor of the Debtor").

Courts in this circuit have interpreted 11 U.S.C. § 727(a)(3) "to apply a shifting burden of proof":

> The Plaintiff must establish a *prima facie* case showing the Debtor failed to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled to perfect, or even necessarily complete, records. Instead, the Debtor must provide the Plaintiff "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In determining the adequacy of records, the court can consider the Debtor's education, business experience, sophistication, or any other relevant factor.

> If the Plaintiffs have established this *prima facie* case, the burden then shifts to the Debtor to explain why the failure to keep records, under the circumstances of the case, is justified. In considering an explanation, the court should consider both the Debtor's credibility and the reasonableness of the explanation, considering the debtor's sophistication and the materiality of the records. The requirement for keeping recorded information is not an unqualified one and complete disclosure is not always required, but instead it is a question of reasonableness under the circumstances. However, if disclosure cannot be made without the keeping of recorded information, the failure to supply the records is relevant to the policy underlying § 727(a)(3).

> The ultimate burden of persuasion, of course, rests with the Plaintiffs. The standard of proof for discharge objections under § 727(a) is by a preponderance of the evidence.

*CM Temporary Servs., Inc. v. Bailey (In re Bailey),* 375 B.R. 410, 415–16 (Bankr. S.D. Ohio

31

2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac),* 235 B.R. 880, 882 (B.A.P. 6th

Cir.1999)) (other citations omitted). In addition, "'[t]he adequacy of debtor's records must be

determined on a case by case basis. Considerations to make this determination include debtor's

occupation, financial structure, education, experience, sophistication and any other

circumstances that should be considered in the interest of justice." *In re Strbac,* 235 B.R. at 882

(quoting *United States v. Trogdon (In re Trogdon),* 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)).

Further, "intent is not an element under § 727(a)(3)." *See Hendon v. Lufkin (In re Lufkin),* 393

B.R. 585, 593 (Bankr. E.D. Tenn. 2008).

The Court finds that the evidence at trial demonstrated that the Plaintiffs did not prove

the elements of a claim under 11 U.S.C. § 727(a)(3) by a preponderance of the evidence. The

Plaintiffs' claim focused on the fact that the Debtor had not kept sufficient records to show how

he had spent their earnest money on their property. The Plaintiffs' expert was provided with the

Debtor's QuickBooks records from this period and was able to determine how the Debtor used

the funds.

## 2.      Section 727(a)(4)(A)

The Bankruptcy Code provides that a debtor shall receive a discharge from the court

unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a

false oath or account. . . ." 11 U.S.C. § 727(a)(4)(A). Courts in this circuit have determined that

to state a claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of

the evidence the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the
> debtor knew the statement was false; (4) the debtor made the statement with
> fraudulent intent; and (5) that the statement related materially to the bankruptcy
> case.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *In re Keeney*, 227 F.3d at 685).

The Plaintiffs' proof relied on statements made by the Defendant in a deposition in a state chancery court proceeding pending prior to his filing bankruptcy in which he denied that he had operated or done business under the name of Perry Development. (Deposition of Vincent Morse read into the record on Nov. 5, 2015, at 9:07:34-9:10:48). The court finds that the Defendant's statements were false and that he did use Perry Development as a trade name for himself or as an alternative name for Deck Masters. The court also finds that the Plaintiffs have proven that the Defendant likely knew the statements were false when he made them. At best his answers were nonresponsive and incomplete.

However, the court does not find that these statements were made in the bankruptcy proceeding or were used to mislead any party from locating assets or finding avoidable transfers. In this court, the Defendant disclosed the trade name with his initial filing. The court finds that the Defendant's statement in the state court litigation does not materially relate to this bankruptcy case and concludes that the Plaintiffs failed to prove by a preponderance of the evidence a claim under 11 U.S.C. § 727(a)(4)(A).

**3.    Section 727(a)(5)**

Section 727(a)(5) allows a court to deny a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). With respect to a Section 727(a)(5) claim:

> [t]he initial burden is on the Plaintiff to establish the loss or deficiency of assets
> by demonstrating that (1) at a time not too remote from the bankruptcy, the
> Defendant owned identifiable assets; (2) on the day that he commenced his
> bankruptcy case, the Defendant no longer owned the particular assets in question;
> and (3) his schedules and/or the pleadings in the bankruptcy case do not offer an
> adequate explanation for the disposition of the assets in question. The Plaintiff is
> not required to prove that the Defendant acted knowingly or fraudulently, as
> "noticeably lacking from § 727(a)(5) is any element of wrongful intent or, for that
> matter, any affirmative defenses-- § 727(a)(5) simply imposes strict liability."

*Roberts v. Debusk (In re Debusk)*, No. 08-3015, 2008 WL 3904448, at *8 (Bankr. E.D. Tenn.

Aug. 19, 2008) (citing *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D.

Ky. 1999) and quoting *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004)).

The court finds that the Plaintiffs did not prove the elements of a claim under section

727(a)(5) by a preponderance of the evidence. In this case, the missing asset, the Plaintiffs'

earnest money, was obtained by the Defendant over two years before he filed bankruptcy; and,

despite this passage of time, the earnest money has been accounted for in sufficient detail for the

court to have found a basis for a finding of embezzlement.

### C.    Unjust Enrichment

As part of their claim for damages, the Plaintiffs argue that they are entitled to $55,000

by which they allege the Defendant was unjustly enriched. (Doc. No. 128, at 7, Amended

Complaint). The Plaintiffs contend that the Defendant was unjustly enriched by this amount

when he built and sold a house on the same lot to a different buyer for $55,000 more than he had

contracted with the Plaintiffs.

The Plaintiffs have not cited any authority for their contention that the Defendant was

unjustly enriched simply because he built a house on the same lot after the Plaintiffs had

terminated the Agreement. The proof showed that the Defendant had not yet begun construction

34

on the Plaintiffs' house when they terminated the Agreement, and the court sees no reason why the Defendant should be penalized for building a house on the lot after there was no longer a contract in place with the Plaintiffs. The Defendant did not use the Plaintiffs' money to build the house and the court does not see any connection between the parties' Agreement and the later sale after the Agreement had been terminated.

Furthermore, the Plaintiffs did not carry their burden of proving that the Defendant was unjustly enriched. Although there was evidence that the Defendant eventually sold the house for more than he had contracted to sell it to the Rices, there was insufficient proof as to the Defendant's actual cost of construction. Indeed, what little proof there was on this issue came from the Defendant's testimony that the eventual buyers had requested "significant upgrades" to the house, which would have been reflected in a higher purchase price. (Testimony of Vincent Morse, Nov. 6, 2015, at 11:29:11). Given these facts, the court finds that the Plaintiffs are not entitled to an award for unjust enrichment.

### D.    Attorney's Fees

The Plaintiffs have also requested attorney's fees and treble damages.

Under the "American Rule," each party pays its own attorney's fees arising out of litigation. An exception exists, however, when specific authority granted by statute or contract—a so-called "fee-shifting" provision—states otherwise. Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in nondischargeability cases, they can only do so if allowed by another statute or by contract.

*In re Kirk*, 525 B.R. 325, 330-31 (Bankr. W.D. Tex. 2015) (internal footnotes omitted).

In *Cohen v. de la Cruz*, the U.S. Supreme Court held that attorney's fees and treble damages could be awarded in a Section 523 nondischargeability claim, if such damages were supported by an underlying state law. 523 U.S. 213, 223, 118 S. Ct. 1212, 1219 (1998).

35

However, as one bankruptcy court explained, "it is clear that *Cohen* does not itself create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable." *Headrick v. Atchison (In re Atchison)*, 255 B.R. 790, 793 (Bankr. M.D. Fla. 2000) (citing *Cohen*, 523 U.S. 213). Thus, a plaintiff is not entitled to attorney's fees merely because of success on a nondischargeability claim.

Where there is no specific statute or contractual right to attorney's fees, Tennessee law follows the American rule pertaining to the award of attorney's fees with only a few limited exceptions. *See Pullman Standard, Inc. v. Abex Corporation*, 693 S.W.2d 336 (Tenn. 1985). In *Pullman*, the Tennessee Supreme Court noted that "[w]e continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity . . . ." *Id.* at 338.

The Plaintiffs base their claim for attorney's fees on the "Default" provision of the Agreement, which provides in relevant part:

> Should Seller default, Buyer's Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing part shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees.

(Tr. Ex. No. 2, p. 8).

Having found that the Defendant breached the Agreement when he failed to refund the earnest money, the court finds that the Plaintiffs are entitled to recover their costs of enforcing the Agreement, including reasonable attorney's fees. The court will hold a separate hearing in

36

order to take proof on the amount of attorney's fees and costs the Plaintiffs are entitled to recover.

The Plaintiffs have also asked for treble damages. The court finds no statutory or contractual basis for treble damages and the Debtor's conduct here is not so egregious that it justifies punitive damages.

### IV.    Conclusion

For the reasons explained above, the court concludes that Vincent Morse, as the alter ego of the Seller, breached the Agreement when he failed to refund the Plaintiffs' $19,500 in earnest money. When the Plaintiffs rejected the revised elevations, the Agreement was terminated and the earnest money became refundable. The Defendant was unable to refund the money because he had spent it on business and personal expenses unrelated to the construction of 840 Dallas Road. The circumstances surrounding his acquisition of the earnest money, his disbursement of the funds, and his reactions upon termination are indicative of fraud. The Defendant used the money contrary to the terms to which he agreed. He embezzled the Plaintiffs' earnest money funds. The record also supports a finding that his conduct caused willful and malicious injury to the Plaintiffs. Therefore, the court will grant a judgment in favor of the Plaintiffs for $19,500 plus reasonable attorney's fees and costs. The court finds that the amount of the judgment is nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). The court will schedule a hearing to determine the amount of attorney's fees to be included in the judgment.

A separate order will enter.

# # #